**Alfred Hannigan, Appellee, v. Elgin, Joliet and Eastern Railway Company, Appellant.**

**Gen. No. 44,555.**

540

Opinion filed May 18, 1949. Rehearing denied June 13, 1949. Released for publication June 17, 1949.

KNAPP, CUSHING, HERSHBERGER & STEVENSON, of Chicago, for appellant; HARLAN L. HACKBERT, of Chicago, of counsel.

JAMES A. DOOLEY, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Alfred Hannigan filed a complaint in the superior court of Cook county against Elgin, Joliet and Eastern Railway Company under the Federal Employers' Liability Act to recover damages for personal injuries alleged to have been sustained while employed as a brakeman on March 10, 1947, when he fell from the brake platform of a boxcar in defendant's yards at East Joliet, Illinois. Sec. 51, title 45, USCA, provides that every common carrier in commerce between the states shall be liable in damages to any person suffering personal injury while employed by such carrier in such commerce, for such injury resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment. The sole ground of liability was that the hand brake was not "efficient" as required by sec. 11, title 45, USCA

(known as the Federal Safety Appliance Act), in that when the brake was released, the brake wheel spun and plaintiff, who was not holding to a grab iron, was thrown from the brake platform and injured. Sec. 11, title 45, USCA, provides that it shall be unlawful for any common carrier subject to the provisions of sec. 1–16 of that title to haul or permit to be hauled or to be used on its line any car not equipped with efficient hand brakes. A trial resulted in a verdict for plaintiff for $40,000. On denial of defendant's motion for a new trial, judgment was entered. Defendant, appealing, asks that the judgment be reversed and that the cause be remanded for a new trial.

Plaintiff, 55 years of age at the time of the trial, was, on March 10, 1947, employed by the defendant as a brakeman, whose duties consisted in getting trains ready, looking trains over and inspecting hand brakes. He had been so employed by the defendant for 23 years, and at the time of the mishap was earning over $300 monthly. Prior to his employment by defendant he had worked for other railroads. He had been a railroad man for 31 years prior to March 10, 1947. He had suffered several accidents; broken ribs in 1927; injuries to his right knee in 1936 or 1939, to his left leg in 1938 or 1941, and to his chest in August 1943; a hernia in 1941; a cyst on his neck in 1944; and in 1943 and again in 1946 he injured his back. On March 10, 1947, he was working as rear brakeman on a run from Gary, Indiana, to Joliet, Illinois, and return. He lived in Gary. Preparatory to the trip to Gary, he was "looking the train over," releasing the brakes and inspecting the cars. The tracks in the yard run north and south. The train was headed south, with the engine at the south end. There was a caboose at the north end. There were 93 cars in the train. The cars were on track No. 3 in C. yard. Part of plaintiff's duties were to inspect and release brakes. He started this inspection at the rear or north end of the train,

working towards the south end. The mishap occurred at about the 40th car from the caboose. Plaintiff testified that it was a Santa Fe steel boxcar about 40 feet long and 15 feet high. The brake, an Ajax type, was on the south end of the car. There was a brake wheel 15 or 20 inches in circumference, made of steel and having 4 or 5 spokes, just beneath the roof of the car. The brake platform was 2 to 2½ or 3 feet below the roof. The platform is where the man stands in operating the brake. It is 12 or 13 feet above the ground, about 10 or 11 inches wide and 3 feet long. There is a dog or lever which holds the brake wheel. There is a chain which runs through the platform and hooks on to the brake shoes, which contacts the wheels. As one releases the brake wheel, he must turn it a little in the direction in which the brake is set in order to release the dog. The wheel is turned in a clockwise direction, then as the brake is released, the brake wheel comes around in a counterclockwise direction. Plaintiff went up on the south end of the Santa Fe boxcar to release a brake. He stood "east of the brake wheel, looking at the wheel"; he turned the brake wheel with both hands "not over half an inch at the most" in a clockwise direction to release the dog or catch; then, he testified, "the wheel came back in a counterclockwise direction and threw me off," which would be to the outside of the car. As he fell, his back struck the draw bar, or coupler, in the center of the car, and he fell to the ground between the track on which the car was standing and the adjoining track. We infer that the place where he fell was to the west of the car from which he fell. After lying between the tracks for a few minutes, he walked to the yard office 400 or 500 feet away; then he was taken in the automobile of a fellow worker to Silver Cross Hospital, Joliet, where he saw an interne. There was a cut on his ear which was bandaged by a nurse. He then returned to the yard office. After making some telephone calls, he was

helped on the caboose of the train and rode on the return trip to Gary, propped up on cushions.

Plaintiff insists that defendant is not in a position to urge that the court erred in giving an instruction at his request because the defendant in its motion for a new trial did not specify the giving or refusal of particular instructions as error, and did not specify the grounds relied upon as error. Plaintiff maintains, under the authority of *Krug v. Armour & Co.*, 335 Ill. App. 222, that defendant has therefore waived and is precluded from raising any question as to the propriety of an action of the trial court concerning the instructions. We do not agree with plaintiff. In the *Krug* case it will be noted that the court considered the instructions on the merits and decided that there was no error in the giving of them. In the case of *Chicago & St. L. R. Co. v. Mines*, 221 Ill. 448, the specification in the motion for new trial was with respect to error in giving "each one of the fifteen instructions numbered from 1 to 15, at the request of the appellees." The court held that this specification was sufficient to include alleged error in modifications of the instructions, although there was no such specification in the motion for a new trial. The court said (456):

"While the language used in designating these objections in the points in support of the motion for a new trial was not strictly accurate, we think it served to advise the trial court that complaint was made of the giving of each of these fifteen instructions, and that is all the law requires."

The *Mines* case was decided in 1906, and the statute then in force was exactly like the provision in the present Civil Practice Act. Sec. 68 of the Civil Practice Act (par. 192, ch. 110, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 104.068]) states that a party moving for a new trial shall file the points in writing, "particularly specifying the grounds of such motion." This

was not a new provision when re-enacted as part of the present Practice Act. A practically identical provision has been a part of the law in Illinois for more than a hundred years. The Practice Act of 1907, which was in force from 1907 to 1933 and which appeared in the Revised Statutes as chapter 110, provides in sec. 77 thereof: ''and if either party may wish to except to the verdict, or for other causes, to move for a new trial, or in arrest of judgment, he shall, before final judgment be entered, or during the term it is entered, by himself or counsel, file the points in writing, particularly specifying the grounds of such motion.'' The Practice Act in force prior to that time contained a similar provision. Smith-Hurd Rev. Stat. 1905, ch. 110, sec. 57 reads: ''and if either party may wish to except to the verdict, or for other causes, to move for a new trial, or in arrest of judgment, he shall, before final judgment be entered, or during the term it is entered, by himself or counsel, file the points in writing, particularly specifying the grounds of such motion, and final judgment shall thereupon be stayed until such motion can be heard by the court. (R. S. 1845, p. 417, sec. 24.)''

The case of *Yarber v. Chicago & A. R. Co.*, 235 Ill. 589, contains an analysis of the historical development of the law with respect to motions for a new trial. The court there points out that the object of the motion for a new trial was not to review any error of law committed by the court, but was to review the question of fact as found by the jury. The court said (601):

''What is now section 77 of the Practice Act has been in force in its material parts, substantially as at present, since 1827. It directs the party moving for a new trial to file the points in writing, particularly specifying the grounds of his motion. We have held that this section is directory, and not mandatory. The party moving for a new trial may be required by the court or the opposite party to file the points in writing, specifying the grounds of his motion. If this is not

required and the motion is submitted without any statement in writing of the grounds therefor and without objection, the requirement of such statement is waived. If certain points in writing particularly specifying the grounds of a motion for a new trial have been filed, the party will be deemed to have waived all causes for a new trial not set forth in his written grounds and in the appellate court will be confined to the reasons specified. On the other hand, if the motion has been submitted without specifying, in writing, the grounds therefor, the party may avail himself of any cause for a new trial which may appear in the record, whether it be the admission or rejection of evidence, the giving or refusal of instructions, the lack of sufficient evidence or any error occurring on the trial. [Citing cases.] . . . In a very recent case, while it was stated that the rule is firmly established that when a motion for a new trial is made and the points relied on stated therein all other points are thereby waived, it was carefully stated that errors in giving or refusing instructions, when exceptions have been properly taken, are saved without a motion for a new trial. *Chicago City Railway Co. v. Smith,* 226 Ill. 178.''

In *People v. Cohen,* 352 Ill. 380, the court said (381):

''Section 77 of the Practice Act directs the party moving for a new trial to file the points in writing, particularly, specifying the grounds of his motion. This court has held that that section is directory and not mandatory, and that if the party moving for a new trial makes either a written or verbal motion for a new trial without stating in writing the grounds therefor and without objection, the requirement of such statement is waived. If certain points in writing particularly specifying the grounds of a motion for a new trial have been filed, the party filing the same will be deemed to have waived all causes for a new trial not set forth in his written grounds and in the Appellate

Court will be confined to the reasons specified. If the motion has been submitted without specifying the grounds therefor in writing, the party may avail himself of any cause for a new trial which may appear in the record, whether it be the admission or rejection of evidence, the giving or refusing of instructions, the lack of sufficient evidence, or any other error occurring on the trial. The above holding by this court is applicable to both civil and criminal cases. (*Yarber v. Chicago and Alton Railway Co.,* 235 Ill. 589; *Anderson v. Karstens,* 297 id. 76; *Bromley v. People,* 150 id. 297.) The foregoing rules applied to motions for new trial are also applied by this court to motions in arrest of judgment, and when a motion in arrest of judgment does not specify the grounds therefor, it will be presumed, on appeal, that every proper ground for arrest of judgment was presented to the court. *People v. Goldberg,* 287 Ill. 238.''

██ Sec. 2, ch. 131, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 27.14], provides that the provisions of any statute, so far as they are the same as those of any prior statute, shall be construed as a continuation of such prior provision, and not as a new enactment. A practically identical provision has been a part of the law of this State for more than 100 years. The opinions of the courts construing that provision in the various practice acts are applicable to the same provision in the present Practice Act. In the case at bar defendant's motion for a new trial stated that the court erred in giving all of the instructions requested by plaintiff and marked ''given.'' If plaintiff desired that the grounds be particularly specified, it was his duty to require defendant to so specify. Not having done so, plaintiff is not in a position to contend that he was not sufficiently apprised of defendant's points on his motion for a new trial.

We turn to a consideration of the first point advanced by defendant that the court erred in giving the jury the following instruction:

"You are instructed that proof of a break or a visible defect in a hand brake is not a prerequisite to a finding that the statute has been violated. One of the tests of efficiency of a hand brake is the performance of the appliance. If you believe from the preponderance of the evidence the hand brake in question failed to work efficiently at the time and place the plaintiff was injured it would be sufficient on which to find that the statute was violated, even though the failure of the hand brake to work efficiently was unexplained and even though it worked efficiently both before and after the occasion in question."

The only charge relied upon by the plaintiff is that the defendant violated the Safety Appliance Act requiring efficient hand brakes, and there is no question of any other negligence or carelessness of the defendant. Defendant asserts that the evidence does no more than to establish that the brake had been set too tightly, and that the testimony does not tend to establish that the brake itself was not efficient; that if the brake was set so tightly that when released the increased tension caused it to spin faster than usual, that was due not to any inefficiency of the brake itself, but to the act of the person who set the brake; that the instruction complained of singles out the testimony that on one occasion the brake "failed to work efficiently" and in effect told the jury that this evidence was of greater importance than the fact that there was no "break or visible defect" in the brake mechanism or evidence of proper functioning before or after the particular occasion; and that evidence that a coupler worked efficiently both before and after the particular occasion has been held as a matter of law to refute conclusively the inference of defect arising from a single failure to function, citing *Penn v. Chicago & N. W. Ry. Co.*, 163 F. (2d) 995; *Western & A. R. Co. v. Gentle*, 58 Ga. App. 282, 198 S. E. 257, certiorari denied, 305 U. S. 654. The *Penn* case was reversed in a memorandum opinion on the basis of *Myers v. Reading Co.*, 331 U. S. 477. See

69 Sup. Ct. Rep. 79. In our opinion the *Gentle* case is not in accordance with the rule announced by the Federal courts. The opinions of the Federal appellate courts are binding on the State courts in actions under Federal statutes. See *Bailey v. Central Vermont Ry., Inc.,* 319 U. S. 350. Defendant argues that it is clear that the jury must determine whether the hand brake was "efficient" or not from all the evidence; that the single failure to function may be one of the factors to be considered by them, but it is not of greater importance than the fact that there was no mechanical or structural defect in the brake, nor does it outweigh the evidence of proper functioning at other times; that the instruction complained of invites the jury to ignore the explanation suggested by defendant that the brake was too tightly set; that plaintiff did not hold to a grab iron as was customary; and that the instruction was prejudicially erroneous in telling the jury in effect that a single failure to function outweighed defendant's explanation of the occurrence.

Defendant, calling attention to *Myers v. Reading Co.,* 331 U. S. 477, points out that there the Supreme Court quoted with approval from *Didinger v. Pennsylvania R. Co.,* 39 F. (2d) 798, that in addition to evidence of some particular defect "the same inefficiency may be established by showing a failure to function, when operated with due care, and in the normal, natural and usual manner." See also *Spotts v. Baltimore & O. R. Co.,* 102 F. (2d) 160, 162, cited in the *Myers* case. Defendant asserts that the instruction in the instant case is virtually a peremptory instruction; that it tells the jury in effect that a single failure of the brake to function efficiently is sufficient to justify a verdict for the plaintiff, notwithstanding the absence of any mechanical defect, or evidence of a satisfactory explanation or proper functioning at other times; that the jury was told to ignore defendant's contention that the brake wheel was merely set too tight, an act of negli-

gence, perhaps, but not of inefficiency of the brake, and that plaintiff was thrown from the platform because he did not protect himself in the customary manner; that there was plaintiff's contradictory testimony as to where he was standing on the brake platform, east of the brake wheel or west of the brake wheel, which direction he was facing; that it was at least a question for the jury whether he was "properly positioned" to operate the brake; that plaintiff admitted that although it was "customary when a brakeman is . . . releasing brakes on a car to hold on to one of the grab irons with one hand and operate the brake wheel with the other," that plaintiff had both hands on the wheel; that the purpose of holding to the grab iron is protection from the spinning wheel when the brake is released; and that plaintiff's failure so to operate the brake was neither "due care" or the "normal and usual manner" of releasing a brake.

■■ The record shows that plaintiff testified that he had operated hand brakes for 31 years; that he had been operating Ajax brakes since they had been in use; and that at the time of the occurrence he was operating the brake in the usual and customary manner. To the question: "When you are operating this brake wheel in the usual and customary manner, what is the normal result?" he answered: "Well, you should be able to release the brake with your hand and hold on to it." When plaintiff released the brake he had both feet on the platform. It was the sudden spinning of the brake wheel that threw him off the platform. It is customary when a brakeman is either setting or releasing brakes on a car to hold onto one of the grab irons with one hand and operate the brake wheel with the other, but in this case, according to plaintiff's testimony, he had to use both hands. To the question: "Will you tell us what the custom and practice is with reference to operating a brake wheel which is with reference to operating a brake wheel which is hard to move?" he an-

swered: "Well, we have to use both hands." He gave an affirmative answer to the question: "Is that the general custom and practice followed by railroad men?" He also stated that such was the general custom and practice which he observed during his career as a railroad man. Plaintiff relies on *Myers v. Reading Co.*, 331 U. S. 477, where the court said that a railroad subject to the Safety Appliance Act may be found liable if the jury reasonably can infer from the evidence merely that the hand brake which caused the injuries was on a car which the railroad was then using on its line in interstate commerce, and that the brake was not an "efficient" hand brake. The court, recognizing two methods of showing the inefficiency of hand-brake equipment, said that evidence may be adduced to establish some particular defect, or the same inefficiency may be established by showing a failure to function when operated with due care in the normal, natural and usual manner. The Federal Supreme Court points out that proof of an actual break or visible defect in a coupling appliance is not a prerequisite to a finding that the statute has been violated; that where a jury finds that there is a violation, it will be sustained if there is proof that the mechanism failed to work efficiently and properly even though it worked efficiently both before and after the occasion in question; and that the test, in fact, is the performance of the appliance. See also *Williams v. New York Cent. R. Co.*, 402 Ill. 494. Plaintiff introduced evidence of the inefficiency of the brake, but did not prove any mechanical or structural defects. In our opinion he had a right to have the jury informed that such proof was not necessary. The testimony of plaintiff showed that he operated the brake with due care in the normal, natural and usual manner. There was no testimony to the contrary, nor any reasonable inference which would give the jury the right to find that the brake was

not operated by plaintiff with due care or in the normal, natural and usual manner. For these reasons we find that the court did not err in giving the instruction of which defendant complains.

Defendant maintains that the verdict is excessive. Defendant states, and we agree, that the burden was upon plaintiff to prove by a preponderance of the evidence not only that the ailments exist, but also that they are the result of the occurrence of March 10, 1947. Plaintiff replies that the question of damages was one of fact for the jury. The evidence shows that on the night plaintiff was injured when he arrived at Gary he was taken to defendant's emergency hospital, where it was found he had abrasions of the left ear and left little finger, and that x-rays were taken which disclosed some fractured ribs, which were taped. He was then taken to Mercy Hospital at Gary, where he was again x-rayed. In the hospital he noticed pain in the back and left side. He was released from the hospital after three days and went back to the emergency hospital every other day until May 7, 1947 for heat treatments. On that day, in the course of an examination by Dr. Joseph C. Donchess, defendant's doctor at Gary, plaintiff said he felt "ready to return to work" and he was given a work slip. He returned to work on May 11, 1947, and worked that night as a rear brakeman, performing the regular duties of that job. His second trip was from Gary to Joliet and on the return trip, as he was ready to get on a moving caboose, his legs "went numb suddenly" and he fell off the step. He was taken to Gary on the caboose and went home. On the second day he went to the company hospital, where he was x-rayed and then given heat treatments every other day until June 13, 1947. He testified that after this second mishap he had "terrible pains" in his back, left leg and side. The pain in his side continued about three months after March, but he testified

he still had the pain in his back and occasionally he has numbness and once in a while a sharp pain down his legs.

On his case in chief, Dr. Horace E. Turner, an orthopedic surgeon, was plaintiff's sole medical witness. He had examined plaintiff at his attorney's request on May 20 and October 6, 1947. Objectively at the first examination he found bruises in the small of the back and on the left buttock, a congenital rounded back and spastic muscles in the back. X-rays taken at that time showed old fractures of the eighth and ninth ribs on the left side and recent fractures of the seventh to tenth ribs in the axillary line on the left side, some roughening of the upper border of the fifth lumbar vertebra, calcified areas in the intervertebral discs between the second and third lumbar vertebrae and the fifth lumbar vertebra and the first sacral segment and a fragment of bone separated from the upper border of the fourth lumbar vertebra. In Dr. Turner's opinion there "could or might be" a causal connection between a hypothetically described occurrence such as the plaintiff testified to and these conditions, and the conditions were permanent. On cross-examination, he testified that in his opinion the fragment off the fourth lumbar vertebra was firmly attached to the body of the vertebra, and that the blow which produced it was one in which the man was "wrenched backward with a fairly good force," with pain at the time; that the source of pain in this man's case was the arthritis of the spine, the calcified discs which are "very painful" and the fragment off the fourth lumbar vertebra; that the calcified portions of the discs accounted for the pain and numbness of which the man complained, because of pressure on the spinal nerves; and that the abnormal x-ray findings "could or might" have been the result of the hypothetically described occurrence. It was Dr. Turner's opinion that the condition of the fourth lumbar vertebra is permanent, and that the cal-

cifications between the second and third lumbar verte-
bra and between the fifth lumbar and the first sacral
segment are likewise permanent, and that plaintiff is
unable to do the work of a railroad brakeman. The
doctor also stated that he prescribed a brace for plain-
tiff to obviate pain by doing away with motion of the
spine. He stated that when he saw the man on Octo-
ber 6, 1947, his clinical findings were the same as on
the previous examination.

Dr. Joseph C. Donchess, the local surgeon at Gary
for the defendant and other industrial concerns em-
ploying about 50,000 persons, who attended plaintiff
after the March 1947 and May 1947 occurrences, testi-
fied that plaintiff did not complain to him during either
period of treatment of pain in the lower back, numb-
ness or shooting pains in the leg, or weakness or diffi-
culty in walking or lifting. In his opinion plaintiff
was able to return to work as a switchman on May 7,
1947. Dr. Donchess testified that x-rays taken after
the occurrence showed that the ribs fractured in the
March mishap had healed in very good alignment. He
discharged plaintiff from treatment on June 13, 1947,
and issued him a work slip for the following day.
Dr. Donchess had also been the attending doctor after
the December 21, 1946 accident, when plaintiff also fell
from a car while releasing a brake. Witness testified
that at that time plaintiff complained of pain over the
lumbar area and left kidney, and that an x-ray taken
at that time showed the calcified areas of the discs be-
tween the second and third lumbar vertebrae and be-
tween the fifth lumbar vertebra and the sacrum, the
bony growth on the fifth lumbar vertebra and the frag-
ment partly separated from the body of the fourth
lumbar vertebra, the same pathology shown in Dr.
Turner's x-rays taken on May 20, 1947. In Dr. Don-
chess' opinion these conditions had existed long before
December 1946. He testified that he showed the x-ray
to plaintiff during this treatment and discussed his

back condition with him. On cross-examination, Dr. Donchess testified that the written record which he made at that time that the ''x-ray does not reveal any fracture or dislocation,'' meant any recent fracture or dislocation, as he specifically stated in his reports to the chief surgeon and the claim agent.

Dr. R. J. Bennett, defendant's chief surgeon and a specialist in general, orthopedic and industrial surgery, compared the x-ray taken December 21, 1946 with the x-rays taken after the March and May 1947 occurrences, and, allowing for different angles and distances from which the films had been taken, found the areas of calcification in the two discs and the fifth lumbar vertebra, the fragment off the fourth lumbar vertebra and the lumbo-sacral disc space ''materially the same'' in all of the x-rays. In his opinion the condition of the discs and the fourth and fifth lumbar vertebrae had existed as early as December 1946, and there had been no essential change in the scope or extent of that pathology between December 1946 and May 1947. He testified that it would require ''a good, solid, forceful blow'' to break off the fragment from the fourth lumbar vertebra, which would definitely be accompanied by acute pain. Dr. Charles P. Galanti, an x-ray specialist, identified the x-rays which he had taken at Mercy Hospital, Gary, on the morning after the occurrence. In his opinion these films showed an ''old, ununited chip fracture of the anterior-superior portion of the fourth lumbar vertebra,'' partial calcification of the two intervertebral discs, and arthritis of the fifth lumbar vertebra. He said that all of these changes were old and that there was no evidence of any recent change in those conditions. He saw no appreciable change in these conditions as shown in the December 1946 x-ray and the x-rays taken by him in March 1947, or the x-rays taken by Dr. Turner in May 1947. Dr. Leon Aries, attending physician at Cook County Hospital, where approximately 10,000 fractures are

treated annually, all of which are x-rayed at least once, and who uses x-rays daily and reviews them with a roentgenologist each day, testified for plaintiff in rebuttal that in his opinion the fragment off the fourth lumbar vertebra was detached in the May 1947 films, which could have been caused by a jackknifing trauma to a back whose prior condition was that shown in the December 1946 x-ray, where the fragment appeared to be attached to the body of the vertebra. In the latter film the fragment appeared to him to be displaced a greater distance from the body of the vertebra than it appeared in the earlier film. On cross-examination, he measured the distance of these vertebral margins from the center of the respective films and admitted that the difference of more than three inches in the two films "will make the margins appear to change." He concluded that the displacement of the previously attached fragment was a "recent fracture."

Plaintiff points out that he has been employed as a brakeman since February 6, 1924, and had previously worked for other railroads; that although he had some prior mishaps while in defendant's employ, he had no injury to his back of such a nature as to require hospitalization; that for each condition he was treated by defendant's doctors; that he was 55 years of age, earning $300 a month; that he had no difficulty in doing the work of a brakeman, which requires agility and strength; that on March 10, 1947, while operating a hand brake, he was thrown a distance of 11 or 12 feet from the brake platform and struck the steel draw bar with the small of his back; that he was taken to one hospital, then to another, and finally to Mercy Hospital in Gary, where x-rays admittedly revealed fractures of the eighth, ninth and tenth ribs on the left side; that he was confined there until March 14, 1947; that thereafter he continued under the care of defendant's doctors, receiving heat treatments until May 7, 1947; that since the occurrence he is suffering from attacks

of numbness in his legs; that on May 9, 1947 he was released by defendant's doctor, and while attempting to work on May 14 his leg went numb and he fell off the step of a caboose; that thereafter he again went to defendant's hospital and reported there every second day for heat treatments until June 13, 1947; that he had done no work since the occurrence with the exception of the time he attempted to return; that he still has pains in his back and an occasional feeling of numbness in the legs, and at other times recurring shooting pains; that he wears a Taylor brace for the purpose of immobilizing his back so as to obviate the pain; that he attempted to go without this brace, but cannot; that he has a fracture of the fourth lumbar vertebra and a calcification of the space between the fifth lumbar and the first sacral segment; and that an injury can cause both of these conditions.

Defendant states that assuming the view most favorable to the plaintiff, the only injuries which he can claim as a result of the March 10, 1947 occurrence are four fractured ribs, now admittedly completely healed and pain-free, and the second breaking off of the once healed old fracture of the fourth lumbar vertebra; that measured by any standard a judgment for $40,000 for such injuries cannot stand; and that the only possible basis for such a large verdict, other than passion and prejudice or a failure to comprehend the evidence and the instructions, would be that the injuries sustained seriously impaired plaintiff's ability to work as a railroad brakeman. Defendant says further that broken ribs, particularly when completely healed and pain-free, do not permanently disable a man from railroading; that plaintiff returned to work 17 or 18 days after the other occurrence when he broke two ribs and worked as a brakeman for 20 years after that; that so far as the refracture of the fragment off the fourth lumbar vertebra is concerned, it is clear that he had worked as a railroad brakeman for months and in all probability for years following the original mishap

which caused that fracture, with the fragment in the position shown in the December 1946 x-ray; and the fact that he could work as a brakeman for two days after the March 10, 1947 occurrence until still another mishap disabled him proves that there was no permanent disability to work as a brakeman resulting from the March 10 mishap. Defendant states further that the x-ray (defendant's Exhibit 8) taken in December 1946 conclusively shows, even to a layman, that the condition as to plaintiff's vertebrae existed prior to March 10, 1947, and is shown by that x-ray. We have viewed the x-rays, but do not feel competent to say that we see anything therein which would authorize us to upset the verdict. . The jury heard the testimony of the witnesses, viewed the films and were properly instructed on the measure of damages. The extent of damages is peculiarly one of fact for the jury. We do not feel that the record in this case warrants any interference by us with the amount of the jury's verdict on the ground that it is excessive.

For the reasons stated, the judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

KILEY and LEWE, JJ., concur.