Ole Jensen (Nancy Jensen, Administratrix of Estate of Ole Jensen, deceased), Appellee, v. Elgin, Joliet and Eastern Railway Company, Appellant.

Gen. No. 47,068.

First District, Third Division.

March 12, 1957.

On Rehearing January 8, 1958.

Released for publication January 30, 1958.

560

Stevenson, Conaghan, Velde & Hackbert, of Chicago (Harlan L. Hackbert, and Dean A. Olds, of counsel) for appellant.

Meyer Z. Grant, Samuel E. Bublick, and Edward Wolfe, of Chicago (Edward Wolfe, of counsel) for appellee.

PRESIDING JUSTICE NIEMEYER delivered the opinion of the court.

Defendant, an interstate carrier, appeals from a judgment for $50,000 entered in an action under the Federal Employers' Liability Act (45 U. S. C. A. sec.

51 et seq.) to recover damages for personal injuries alleged to have been sustained by the plaintiff, a switching foreman employed by defendant in its yard in South Chicago, Illinois while making up a train for Gary, Indiana.

In this work the switch engine and cars moved by it passed over a slab yard puzzle, or multiple, switch which served the slab yard in which outgoing trains were made up, and the train yard in which inbound trains were broken up. The switch was in constant use 24 hours a day. Two other puzzle switches were nearby. These switches were in what one witness calls "a dirty place"; dust from the blast furnaces of the United States Steel Company plant, as well as sand, dirt, coal and cinders collected on them. An oiler who worked Mondays through Fridays was assigned to clean them daily. He started at 8 o'clock a. m., daylight time, and his first work on each day, which generally took him until noon, was to clean and oil the switches as he was able to do so in the intervals when they were not in use. The alleged injury to plaintiff occurred on Thursday, July 29, 1954, about 9:40 o'clock a. m., apparently standard time.

Plaintiff, about 50 years of age at the time of the trial, started working for defendant in 1930; in 1952 he was yardmaster; he resigned in 1953 and thereafter worked more or less regularly as a switchman up to early August 1954; he was familiar with the switch, which is thrown by moving an iron lever, 30 to 40 inches long with an iron ball and handle weighing about 30 pounds at the end, from the ground through an arc of 180 degrees to the ground on the opposite side. He testified that he lifted the switch lever to an angle of 45 degrees; he observed it was tight; he then used both hands on the ball, lifting it 4, 5 or 7 inches when "it jerked me" and "sprung like"; he let go of the lever and it went back to its original position; he

560b

felt a sharp pain in the lower region of his back. He then made an inspection of the switch and noticed slag, coke, breeze, granulated cinders and sand in the space of 3 or 4 inches between the switch point—a guide rail about 25 feet long "to guide the car into the track you want to let it in"—and the rail of the track. He also noticed rust on the switch points, and that they had not been oiled or greased.

Plaintiff's theory is that "his injuries were sustained when he endeavored to throw a puzzle switch which the defendant knew, or should have known by the exercise of ordinary and reasonable care, was in an unsafe and inoperative condition by reason of the fact that it had not been properly oiled and maintained." In support of this theory Clinton Hanley, a member of the switching crew and an employee of the defendant for 26 years, called by plaintiff, testified that on the morning of July 29, 1954 he "threw the lever of the puzzle switch. It threw real hard"; it was hard to pull the lever up; the switch was dirty and full of debris, dirt and slag, and needed oiling and sweeping out in order to work good. He first noticed the switch was in that condition about three of four days before July 29th; in that period he reported the fact to the section foreman, the roadmaster or track supervisor, Karpinski, his yardmaster, the safety inspector, and the general yardmaster; shortly after the accident he reported the condition of the switch to Karpinski, and Steve, the section foreman. On redirect examination he testified that he had told his employer about a month after the accident that the switch "throws all right after it is oiled and greased and cleaned out."

Three of defendant's employees, to whom Hanley claimed he had reported the condition of the switch, testified positively that he had not made any report to them. The remaining two employees testified they had no recollection of any report by Hanley. However, as

560c

defendant in its reply brief admits that "the schedule of daily cleaning warrants the inference that the switch needed to be cleaned daily," reports, if any, on the condition of the switch are immaterial. Kirill Evansov, who was assigned to oil the slab yard puzzle switch and the two switches nearby, testified that he could not remember where he was working as oiler on July 29, 1954; during July of 1954 he started to work at 8 o'clock, daylight time, and would commence on the slab yard puzzle switch if there was no switching to prevent it; it takes about four hours to clean and oil the three switches. On cross-examination he testified that between 9:40 and 10 o'clock in the morning his foreman told him to clean the puzzle switch; that the foreman told him to clean the switch at 8 o'clock in the morning and he cleaned it at 8 o'clock; he did not clean it again at 10 o'clock; he only cleaned it once between 8 and 9 or 11 o'clock—it depends upon the switching. Karpinski, assistant yardmaster, whose office was about 20 feet from the slab puzzle switch, testified that plaintiff came to his office about 9:40 in the morning and said that he hurt his back throwing the puzzle lever; he, Karpinski, sent plaintiff to the hospital and then went over to the switch and threw it—you had to use a little pressure to throw it; he did not see any defects or anything wrong with the switch; he did not notice any debris, cinders or sand or anything of that kind in the neighborhood of the switch points; he had a section man oil the switch about ten minutes later, after he operated the switch.

██ The necessity of oiling the switch daily is conceded. The testimony of the oiler as to whether he had oiled the switch before plaintiff attempted to throw it is uncertain. There is a direct conflict in the evidence as to the condition of the switch immediately before and at the time of the occurrence herein. Karpinski had it oiled immediately after plaintiff reported that

he had injured his back and he, Karpinski, had thrown the switch. Whether the oiling was done in order to put the switch in proper working condition, was a question for the jury. The court did not err in refusing to enter judgment for defendant notwithstanding the verdict. Williams v. New York Cent. R. Co., 402 Ill. 494.

■ ■ Plaintiff contends that in cases under the Federal Employers' Liability Act the state courts of review cannot, in accordance with their general practice, weigh the evidence and reverse and remand a case for a new trial because the verdict is against the manifest weight of the evidence. We have decided this question adversely to plaintiff in Bowman v. Illinois Central R. Co., 9 Ill.App.2d 182, 200–203, now pending on appeal in the Supreme Court. In addition to what we said in that case, we call attention to Corcoran v. City of Chicago, 373 Ill. 567, where the court discussed the practice of the early common law courts in granting new trials. In the instant case we cannot substitute our judgment for that of the jury on the question of liability. A contrary conclusion as to the damages awarded requires further examination of the evidence.

Plaintiff testified that he immediately reported his injury to the yardmaster, then went to the company hospital, walking about two blocks; he had pain in the lower region of his back and in his legs, more in the right leg than in the left leg; a doctor examined him, taped his back and gave him pills to relieve his pain; he worked the remainder of the day, about half an hour, and thereafter until August 8th; he did not work any place after that and did not try to obtain any employment; he was treated by defendant's doctors, going to the hospital every other day and receiving heat treatments and then vibrator treatments on the lower part of his back until September 14, 1954, when he was discharged from further treatment and given a back-to-work slip.

In the middle of August 1954 he went to see Dr. Willard Shabat; he saw him at least twice a month from that time until June 7, 1955; the doctor examined him and sent him to Dr. Zeitlin for X-rays; Dr. Shabat ordered a brace for his back, gave him pills to relieve his pain and had him use a heat pad on his back and a bed board; he went to Dr. Zeitlin twice for X-rays, once in August 1954 and again a week before the trial; he did not tell the company doctor that he was seeing Drs. Shabat and Zeitlin. Dr. Shabat died some time in the summer of 1955. Plaintiff went to Dr. Joshua Spiegel in August 1955 at the suggestion of one of his attorneys; he told Dr. Spiegel that he had a law suit pending; he knew that Dr. Spiegel was to make a report to his lawyer as to his findings; Dr. Spiegel advised him to continue wearing the brace, gave him some pills, told him not to do too much walking or bending or any violent exercise; other than the advice given him, Dr. Spiegel did not give him any treatments, never had him go to a hospital and never sent him anywhere for X-rays; plaintiff saw Dr. Spiegel ten times, the last time being in the week preceding the trial; he has not noticed any change in his condition during the time he was under treatment by Drs. Shabat and Spiegel; the back brace that he wears relieves the pain in his back, but he still has pains; they are severe and are not diminishing; the only treatment he was taking at the time of the trial was the use of the heat pad, the bed board and the back brace; he was still taking the pain pills.

Dr. Louis Silver, an associate of Dr. Zeitlin, interpreted the X-rays taken in the latter's office. He testified the films showed a slight scoliosis to the right of the lower lumbar and upper sacrum, a minimal spurring or arthritis on the fourth lumbar vertebra and a subluxation or malalignment—the posterior portion of the fifth lumbar vertebra being somewhat posterior to

· 560f

the upper portion of the first sacral vertebra; that the subluxation could have been produced by trauma; that the minimal arthritis in the X-ray films is a very common finding in persons of 50 years of age who have led an active physical life; the lateral scoliosis, or bending of the spine, slight, moderate to the right, is not frequently seen in normal, pain-free persons; a preceding witness (Dr. Joshua Spiegel) said that the slight posterior displacement of the fifth lumbar vertebra above the sacrum may be congenital in origin, and "I can't disagree with him"; I think from the films that it is not congenital; I know only from the films that it was present in 1954; and it is present at this time, 1956; I would only be guessing as to how long prior to the 1954 film that condition may have existed; I wouldn't want to say.

Dr. Joshua Spiegel examined plaintiff on August 2, 1955. The doctor knew that the patient had been referred to him by the lawyer, and assumed from that fact that a law suit was pending or a claim had been filed and that he might be called upon to testify in a law suit; he had that in mind when he inquired of plaintiff as to his complaints of pain. He made a report of his examination to plaintiff's attorney. Plaintiff complained of pain in the lower back which radiated down through the right hip, thigh, leg and ankle into the right toes, and was accompanied by numbness and tingling in both legs, particularly in the right foot; the doctor gave plaintiff a Nafziger, Fabere and Lasegue test; the responses to the first two tests were normal; in the Lasegue test the patient lies flat on a table and the leg is elevated and flexed on the body; a positive sign is elicited when the patient complains of pain either along the course of the sciatic nerve, on the back of the thigh, behind the hip, or in the middle of the lower back; on the test plaintiff developed pain at 100 degrees (the leg being fixed 10

degrees beyond the upright angle) in the back of the right thigh, going into the middle of the back; the presence of pain is determined by the statement of the patient that he feels the pain, and secondly by the tensing of the hamstring muscles of the thigh as it is brought upwards; the tensing of the hamstring muscles is under the voluntary control of the patient; while it is possible for a clever actor to fool him, he, the doctor, did not believe that the plaintiff could fool him with a false response; his findings were that the normal lumbar lordosis was moderately lost; the paravertebral muscles on either side of the lumbosacral spine were in spasm; percussion with a rubber hammer over the tips of the spinuous processes, the spines of the fourth and fifth lumbar and the first sacral spines elicited tenderness not present in other parts of the body; there was no difference in the measurement of the right and left legs at the thigh and the calf; the flexion of the lumbar spine was limited in bending backward and forward and turning to the side; he instructed plaintiff to avoid any acute back bending, heavy weight lifting or any protracted walking, standing or straining of any kind and told him to sit only in straightback chairs and if possible to sleep on a board between the mattress and springs; his diagnosis of plaintiff's condition was a rupture of the intervertebral disc, either between the fourth and fifth lumbar vertebrae or between the fifth lumbar and the first sacral vertebrae; the intervertebral disc lies between the vertebral bodies and serves as a cushion; it consists of a soft pulpy material, or nucleus pulposus, surrounded by a very firm fibrocartilaginous substance, annulus. At plaintiff's last examination, a few days preceding the doctor's testimony, plaintiff's complaints were identical with those on the original examination, except that he complained of more pain in the lower extremities than he had in the past; the doctor

560h

did not change any of his previous instructions except to give a little stronger medication to relieve the pain; the condition which he found in plaintiff is permanent and irreversible—the rupturing or ruptured intervertebral disc between the fourth and fifth lumbar, or between the fifth lumbar and the first sacral cannot spontaneously, which means by itself, improve; plaintiff should continue to have medical treatment, and there is a further possibility of a need for an operation; at the present time he would not advise an operation; very likely we could improve the pain which is radiating down the right lower extremity and the numbness and tingling down both the lower extremities, but I am not convinced we could improve the lower back pain; plaintiff cannot perform duties which require a great deal of bending or lifting, protracted standing, the climbing on box cars or any hard work that would require bending, stooping or protracted walking or standing.

On cross-examination he testified that the limitations of motion of the legs and back of the plaintiff described by the witness are based on plaintiff's complaint of pain; a ruptured intervertebral disc is correctible by surgery; he does about five, maybe seven intervertebral disc operations a week, and would estimate that in about 70 per cent of the cases of intervertebral disc operations the patients are cured, in about 15 per cent they are improved to a point where they can do most things but have complaint of pain which is tolerable, and in 10 per cent of the operations there is no improvement; it is a relatively common type of operation, performed by neurosurgeons and also by orthopedic surgeons; in competent hands it is not attended by any significant risk to the patient other than the risk that is normally attendant upon the performing of a major surgical operation; he never prescribed surgery for plaintiff for the reason that he

believed his condition might improve under conservative treatment; his condition has remained relatively stable and it is possible that the ruptured intervertebral disc may recede—go back into place; he did not take any X-rays of plaintiff and had not seen any X-rays when he made his initial report; since then he talked with the X-ray man (Dr. Zeitlin) and discussed the X-rays with him; he also got a report from Dr. Zeitlin's laboratory; his opinion as to plaintiff's diagnosis is not particularly based on the X-ray report; that report merely ruled out any advanced degree of osteo-arthritis or spondylolisthesis—a slipping forward of the fifth lumbar on the first sacral vertebra; the report referred to a subluxation—that is, a slipping—of a vertebra out of its normal position; it stated there was a slipping backward of the fifth lumbar vertebra upon the first sacral vertebra; if a posterior subluxation of that type is severe enough it can produce the symptoms of pain of which plaintiff complained without there being any rupture of the disc; in only about 20 per cent of the cases can we tell whether there is a protrusion of the intervertebral disc into the spinal canal by a view of the X-rays; if the space between the vertebrae on the X-ray is narrower than normal, that may indicate the intervertebral disc has spread out like a cushion and produced pressure on the spinal cord; it is only pressure on the spinal cord or the spinal nerve roots that can explain the sensation of pain down the thigh and leg; the fact of a protruding intervertebral disc can be demonstrated by certain X-ray techniques known as a pantopaque myelogram—a technique whereby a radio-opaque substance is injected into the spinal canal; another technique is a discogram, where dyodrast, a radio-opaque material, is injected into the center of the pulpy nucleus of the supposed ruptured disc; a discogram may be performed on more than one intervertebral disc at a time.

560j

■■■■■■■■■■■■■■■■■

Dr. Spiegel then testified that from his diagnosis of plaintiff he concluded there was a possibility of a rupture of one or more of the intervertebral discs that he mentioned; he did not perform either a myelogram or discogram on plaintiff in the process of his diagnosis as to plaintiff's condition; an operation would probably relieve his radiating pain, but he felt certain it would not relieve his low back pain sufficiently to warrant surgery; it is his opinion that the low back pains are caused by the posterior, longitudinal ligament, which is behind the annulus in the intervertebral disc; these two structures are very highly supplied with sensory nerve endings and when barely touched cause pain; he does not believe that removing the offending intervertebral disc would in any way change the fact that he has a herniated posterior longitudinal ligament which is subjected to movement; it is unlikely that the condition of the stretching of the ligament would improve in time; there is a possibility that he could improve, and he, the doctor, has seen patients spontaneously get better, but it is unlikely; the subluxation of the fifth lumbar vertebra is a condition which may be congenital in origin; such congenital condition may predispose the individual to injury from activity which a normal person could do without harm; as far as Dr. Zeitlin's interpretation of the X-rays is concerned, the subluxation which he found may or may not be congenital.

Dr. Fred R. Zeiss, an orthopedic surgeon, examined plaintiff at the company hospital on July 30, 1954, and again on August 9th following, when plaintiff stated that he was getting worse. He testified that on the first examination he diagnosed plaintiff's condition as a sprain of the muscles of the low back; the second examination was very complete; it included the Lasegue test, the result of which was normal, he being able to flex the plaintiff's thigh 100 degrees, or 10 degrees

560k

■■■■■■■■■■■■■■■■■■■

beyond the upright angle; X-rays taken under his direction showed no pathological or unusual findings; in the examination he found no objective findings in reference to the complaints of plaintiff; the subjective symptom of pain was in keeping with a ruptured intervertebral disc, but there were no objective findings to confirm it; he was of the opinion that plaintiff could do the work of a switchman. Dr. Richard J. Bennett, chief surgeon for defendant, examined plaintiff on September 14, 1954. He testified that it was his opinion plaintiff was able to return to the normal duties of a railroad switchman; he based his opinion on the fact that plaintiff gave him only subjective symptoms; that plaintiff did not have sufficient signs or objective symptoms of a protruded intervertebral disk, such as muscle spasm, narrowing of the space between the vertebrae where the disk has been pushed out, atrophy, change in the reflexes and loss in knee jerk and ankle jerk.

As to the excessiveness of the verdict, defendant raises two objections: Failure to show a causal connection between plaintiff's claimed injuries and his accident; secondly, not sufficient evidence that plaintiff's injuries, if caused by the accident, have injured him to the extent of $50,000.

Dr. Spiegel's final statement of his diagnosis of plaintiff was a possibility of a rupture of one or both of the intervertebral discs between the fourth and fifth lumbar vertebrae or between the fifth lumbar and the first sacral vertebrae. On cross-examination he mentioned a "herniated posterior longitudinal ligament."

■■■■ Plaintiff's witnesses Drs. Silver and Spiegel testified that the subluxation of the fifth lumbar vertebra may be congenital in nature. Dr. Silver said that it could be produced by trauma; that he knows only from the films that it was present in 1954 and at the time of the trial, and would only be guessing as to

how long prior to 1954 it may have existed. He does not testify that it could have been caused or affected by an accident such as plaintiff described. There is no testimony that the other conditions shown by the films, or the ruptured intervertebral disc or herniated posterior longitudinal ligament, might or could be caused or affected by trauma or accident of any kind. The burden was upon plaintiff to prove by a preponderance of the evidence not only that the ailments exist, but also that they were the result of the occurrence of which he complains. Hannigan v. Elgin, J. & E. Ry. Co., 337 Ill. App. 538, 551. The ill-being of plaintiff and its cause (except possibly the sprain of the muscles of the low back) are matters of expert opinion which should be proved by the testimony of medical experts and not left to the speculation of the jury. Blarjeske v. Thompson's Restaurant Co., 325 Ill. App. 189, 194; Duncan v. Martin's Restaurant, Inc., 347 Ill. App. 183, 188. On failure to prove a causal connection between the accident and the elements of damage sought to be charged to the accident, no recovery can be had. Allison v. Chicago Transit Authority, 336 Ill. App. 224 (abst. No. 44191).

■■ Moreover, plaintiff's evidence is insufficient to support a finding that plaintiff was suffering from a ruptured intervertebral disc or a herniated posterior longitudinal ligament. Dr. Spiegel is the only witness testifying on this subject. His first diagnosis, adhered to on his direct examination on the trial and based solely on subjective symptoms—pain suffered by plaintiff and the tenseness of his muscles, was a ruptured intervertebral disc between the fourth and fifth lumbar vertebrae or between the fifth lumbar and the first sacral vertebrae. He does not definitely locate the ruptured disk. Subjective symptoms are admissible only when made known to a physician under circumstances which free them from the suspicion of having

been elicited with reference to present or future litigation (Illinois Cent. R. Co. v. Sutton, 42 Ill. 438), because it must be assumed that a man will not lie to a doctor from whom he hopes to obtain medical aid. King and Pillinger, Opinion Evidence in Illinois, page 93. Although Dr. Spiegel appears as a treating physician, the subjective symptoms were elicited under circumstances greatly impairing their probative value, if not rendering them inadmissible. We do not decide the latter question. One of the purposes of the examination, if not the chief purpose, was to give plaintiff's attorney a report on plaintiff's condition. This fact was known to the doctor and to plaintiff. They also knew that this law suit was pending and that the doctor might be called upon to testify for plaintiff. The doctor had these facts in mind when he inquired of plaintiff as to his complaints of pain. Plaintiff had the same facts in mind when he answered the doctor.

■ Moreover, the doctor did little in treating plaintiff for his troubles other than attempting to lessen the pain. Beyond observing plaintiff during the examinations, he took no steps to ascertain the truth or falsity of the subjective symptoms. He testified that the report of Dr. Zeitlin on the X-rays made no reference to a ruptured intervertebral disc; that in only about 20 per cent of the cases would a ruptured disc appear on a film. He did not use known X-ray techniques, such as a myelogram or a discogram, to ascertain whether or not plaintiff had a ruptured disc. The inadequacy of his examination having been developed on cross-examination, he retreated from his positive diagnosis of a ruptured intervertebral disc to a diagnosis of a possibility of a rupture of one or more of the two intervertebral discs he had mentioned. Damages arising from a possible ruptured intervertebral disc are merely speculative and not recoverable. Salaban v. East St. L. & I. Water Co., 284 Ill. App.

560n

358, cited in Allison v. Chicago Transit Authority, supra, 336 Ill. App. 224 (abst. No. 44191).

■ What has been said with reference to proof of the ruptured disc applies with equal effect to the herniated posterior longitudinal ligament, which appears from the testimony to be predicated upon a spreading of the ruptured disc to contact with the ligament. Because of the failure of this evidence, the possible damages recoverable by plaintiff are limited to damages arising from the sprain of the muscles of the lower back, diagnosed by defendant's doctor on the day following the accident, and the award of $50,000 for these damages is grossly excessive. The judgment must be reversed and the cause remanded for a new trial as to plaintiff's damages.

■ ■ The questions raised by defendant with respect to the ruling of the court on evidence in the examination of Hanley and the refusal of the court to give defendant's instruction No. 4 relating to negligence, are now moot and need not be considered by us. Defendant objects to the giving of plaintiff's instruction No. 12 on damages, on the ground that the injuries for which damages might be awarded were not limited to injuries proved by a preponderance of the evidence to have resulted from the accident complained of. A like instruction was held to be faulty for this reason in Collins v. Elgin, J. & E. Ry. Co., 325 Ill. App. 572 (abst. No. 43008).

On the oral argument of this case defendant gave notice that it was preparing and would immediately file in this court a petition in the nature of a motion for new trial, under section 72 of the Civil Practice Act, on the ground of newly discovered evidence. After our decision of the case had been reached defendant presented its petition supported by affidavits purporting to show that plaintiff was employed as a casual day-rate laborer by Miller Carlson Services, Inc., from

April 28, 1956 until July 21, 1956 (judgment was entered herein April 3, 1956), performing physical labor such as loading, packing and crating various objects; that plaintiff was employed by the North Austin Van Lines on a more or less permanent basis from July 14, 1956 to August 13, 1956, when he was injured. (He died August 23, 1956 and his administratrix was substituted as party plaintiff.) In this employment he worked as a furniture and piano mover, carrying the furniture from the place of removal to the van, lifting and carrying various objects, both very heavy and light, loading and unloading trucks; he appeared to be normal in his physical actions and was able to perform all of the required duties of his job, using his limbs, legs and back without any complaint of pain or indication that he was not able to do this work. Defendant asked leave to file its petition in this court; that the petition be remanded to the trial court for disposition, or in the alternative that leave be granted defendant to file the petition in the trial court and that that court be directed to hear and dispose of the petition. Without tendering an issue of fact, plaintiff filed legal objections to the granting of the motion. Defendant's right to relief is supported by Haaga v. Saginaw Logging Co., 170 Wash. 93, 15 P.2d 655, a series of Minnesota cases commencing with Kroning v. St. Paul City Ry. Co., 96 Minn. 128, 104 N. W. 888, and 5 C. J. S. page 1307. Remandment of the case for a new trial on the question of damages gives defendant the relief sought—the right to introduce evidence of the facts stated in the affidavits. Further orders are unnecessary. The petition is denied.

The judgment is reversed and the cause remanded for a new trial on the question of plaintiff's damages.

Reversed and remanded.

BURKE and FRIEND, JJ., concur.

PRESIDING JUSTICE BURKE delivered the opinion of the court.

We adhere to the view expressed in our previous opinion that the finding of the jury on the question of liability should not be disturbed. We followed Bowman v. Illinois Cent. Ry. Co., 9 Ill.App.2d 182, 202–3, in deciding that the verdict on the question of damages was against the manifest weight of the evidence. Since our opinion was filed, the Supreme Court, in reversing our judgment in the Bowman case and reinstating the judgment in favor of the plaintiff, decided that in Federal Employers' Liability Act cases we are limited to determining whether there was an evidentiary basis for the verdict, and that it is error to reweigh the evidence and set aside the verdict. We conclude that on the record in the case at bar we do not have the right to decide that the finding of the jury on damages is against the manifest weight of the evidence.

In the opinion we pointed out that an instruction similar to plaintiff's instruction No. 12 on the subject of damages was held to be faulty in Collins v. Elgin, Joliet and Eastern Ry. Co., 325 Ill. App. 572 (Abst.). Defendant objects to the giving of this instruction on the ground that the injuries for which damages might be awarded were not limited to injuries proved by a preponderance of the evidence to have resulted from the occurrence. Under the instruction the jury was authorized to bring in a verdict "for the full amount of the damages" resulting from any physical condition existing at the time of the trial and which might extend into the future without regard to any causal relationship between the throwing of the switch and the existence of those conditions. The misconception conveyed to the jury by the instruction was not dissipated by any other instruction. Our analysis (in the previous opinion) establishes the tenuous basis on

which an award of $50,000 in damages rests. In this situation instruction No. 12 was prejudicial to a fair trial on the question of damages. Because of the giving of this instruction defendant should have a new trial on the question of damages. Remandment of the cause for a new trial on the question of damages gives the parties the right to introduce evidence as to the employment and activities of Ole Jensen following the entry of the original judgment.

The judgment is reversed and the cause is remanded for a new trial on the question of plaintiff's damages.

Judgment reversed and cause remanded with directions.

FRIEND, J., concurs.

BRYANT, J., took no part.