**Joseph Del Raso, et al., Plaintiffs-Appellees, v. Elgin, Joliet and Eastern Railway Company, a Corporation, Defendant-Appellant.**

**Gen. No. 50,434.**

First District, Fourth Division.

June 16, 1967.

ENGLISH, P. J., dissenting.

Stevenson, Conaghan, Hackbert, Rooks and Pitts, of Chicago (Harlan L. Hackbert, of counsel), for appellant.

Nat P. Ozmon and Robert A. Sprecher, of Chicago (Meyer Z. Grant, of counsel), for appellees.

MR. JUSTICE McCORMICK delivered the opinion of the court.

The four plaintiffs brought an action under the Federal Employers' Liability Act * to recover for the in-

---

\* 45 USC § 51 reads, in pertinent part: *Liability of common carriers by railroad, in interstate or foreign commerce, for injuries to employees from negligence; definition of employees.*

Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially,

---

\* See Callaghan's Illinois Digest, same topic and section number.

juries they incurred from lead poisoning they sustained while in the employ of the defendant railroad. The jury brought in separate verdicts for each of the plaintiffs in sums of $14,500 for Del Raso, $12,500 for Dalpiaz, $8,000 for Sybert, and $3,000 for Benson. Judgment was entered on the verdicts. The court denied defendant's motions for judgments notwithstanding the verdict, or, in the alternative, for a new trial. From these judgments and from the order denying the motions after verdict, the defendant brings this appeal.

It is defendant's position that there was not sufficient evidence to show that it knew or should have known of the presence of lead paint on the railway cars on

affect such commerce as above set forth shall . . . be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.

45 USC § 53 reads: *Contributory negligence; diminution of damages.*

In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided,* That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

45 USC § 54 reads: *Assumption of risks of employment.*

That in any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

which plaintiffs were working; that the court erred in refusing to instruct the jury on the issue of defendant's lack of knowledge of the existence of a hazard of lead poisoning; and that the court erred in withdrawing the issue of contributory negligence from the jury. Moreover, defendant argues that the verdicts were excessive.

Defendant had employed the four plaintiffs for several years and in October of 1955 had assigned them to stripping a particular series of gondola cars (the 31,000 series) prior to defendant's rebuilding such cars. As shown by the evidence, a gondola car is an all-steel car with a flat door, sides about five feet high, and no roof. To strip such a car defendant's employees remove the rivets and then pull out the floor with a crane. Other parts of the car are removed in a certain order thereafter. The plaintiffs were assigned to working on the initial stage of the stripping process. The critical event in their work, as it concerns this case, is the method by which they removed the rivets, by "burning" them. The intense flame from an acetylene torch was directed onto a rivet head which had been painted over; when it was "cherry red" the rivet head would be blasted off. However, as the area heated the paint thereabouts would smolder and boil, releasing noxious smoke and fumes. These gaseous wastes would be inhaled to some extent by the operator of the torch, since he had to hold the flame of the torch at least 18 to 20 inches away from his face so that he could see what he was doing, and inasmuch as the defendant had not supplied the operator with any protective breathing device until after plaintiffs became ill. Benson, for example, testified:

> "That is hot metal and the paint would be smoking all the time you were cutting the rivet out. The smoke would be going in your face and the metal would be flying back at you. You had to do it the best way you could because you had to be close or you coudn't get the rivets out successfully. After

350

you had been doing this work for a couple of hours you would be just as black as coal."

Dalpiaz stated that "when you would burn off the paint you would get sort of vapor and fumes and black smoke." Sybert testified that "we had to burn the rivets and blow them and got the fumes which would make you cough and feel faint." The evidence showed that each man removed approximately 250 to 300 rivets by this process each 8-hour working day. The defendant supplied plaintiffs with protective clothing (plain overalls, canvas jacket, burner's goggles, leather gloves and leather leggings) but not with inhalators or masks until three months after plaintiffs began complaining that they thought the smoke was making them ill.

Benson testified that he was assigned to the burning job in the first week of October 1955; that in the latter part of that month he began to suffer from nausea, stomach pains, and loss of appetite; that in the following month these disorders increased and he felt pains in his legs. At that time the defendant had the series 30,000 and 31,000 gondola cars on the stripping tracks. Benson told the court that the men on the burning job noted that there was a red paint under the outer coating of black paint, and that the men called this undercoating "lead paint." In October and November, according to Benson's testimony, he approached his foreman, one Ernie Koleto (who was deceased at the time of the trial), and complained that the smoke was bothering him and that he thought it was something in the paint; Koleto replied that if Benson didn't want the work he could go home; Benson returned to work, but again complained in November, at which time Koleto told him to return to work, that "it must be old age creeping up . . . ." After these two conversations with Koleto, Benson testified, the defendant company still did not provide Benson with any equipment to protect him from the fumes. Prior to the time he was hospitalized, Benson and several

of his fellow employees were laid off for nine days after they had taken an unauthorized break from the burning job; at that time they told the supervisor that the smoke was making them sick and they would like to get off the burning job, but the supervisor refused. Benson further testified that in early February 1956 when he went to his doctor he immediately thereafter stopped working as a burner, and entered the hospital where he was placed under the care of defendant's doctor.

The testimony of Del Raso, Sybert and Dalpiaz was substantially similar. Del Raso went to his physician in December; Sybert went on about December 28 to see a doctor who was associated with defendant's doctor; Dalpiaz went in February to see a doctor who sent him back to the railroad, and after seeing his general foreman, was sent to the hospital.

It was brought out in testimony at the trial that lead is a toxic material and its main effect on the human body is its attack on the central nervous system; it also causes nutritional disbalance which in turn causes loss of weight, lack of appetite, and constipation. The individual may suffer from irritated gums, and his teeth may become loose and require removal. There is a certain amount of lead in the system of the normal, healthy person; lead is found to a certain extent in the food one eats—fruits, vegetables and meats. Abnormal amounts of lead can enter the system if a person ingests, eats, or inhales lead in some form, or if he absorbs lead through the skin. In the case of these plaintiffs, they were exposed to fumes from burning lead paint. The lead entered their bodies through the lungs and was picked up in small quantities by the blood stream and distributed through the body; the hemoglobin in the blood carries the lead. Defendant's doctor described the lead as "toxic to everything it touches." Eventually the lead joins with or is compounded with calcium and is deposited in the bones; without outside interference it will stay there and no

352

longer be harmful. Generally, a person suffering from lead poisoning is treated as follows: He is removed from exposure to lead; he is given abundant quantities of liquids and large doses of calcium and vitamin D, along with intravenous injections of sodium calcium versenate to hasten the process by which the lead is either deposited in the bones or is excreted. Sometimes the individual is given sedatives to relieve the pain and vitamin pills to improve the appetite. Lead poisoning is painful because of the irritation it causes to the nervous system. When the individual returns to a relatively normal level of lead content in his blood and urine he can return to normal activities.

From the evidence in the record, each of the plaintiffs was suffering from lead poisoning which revealed itself through the symptoms described above and through X rays, blood and urine tests. Each plaintiff was treated for such malady and later discharged from the hospital with a medical finding that he could return to work. Del Raso testified to having suffered from stomach cramps, weak appetite, headaches, vomiting and chest pains. He was hospitalized twice, the first time for two weeks and the second time for about one week. He was placed on a special diet, given shots, and fed intravenously. He continued to be under medical care for five months after his second release from the hospital, after which he changed doctors and was hospitalized a third time for about two weeks, and stayed under the care of this doctor for a year and a half. He complained that he still felt some of the effects of the poisoning, although he was no longer taking any medication.

Dalpiaz stated that he initially suffered from nausea and stomach pains; that everything tasted as if he were "eating paint or metal"; that after he complained to his foreman his condition continued to deteriorate; that he couldn't eat or drink, his head severely ached, he had pains in his arms, legs, chest and mouth, and his teeth

all became loose and ached. He was hospitalized in February 1956, and remained away from work for 28 days; he went into the hospital again in 1957 for about a week. He testified that he was still taking some medication for his continuing nervousness and that his teeth were still sensitive to hot and cold foods. He also stated that he had gone to the hospital in 1962 because of a recurrence of the symptoms.

Benson told the court that he began suffering from nausea, stomach pains and loss of appetite in October 1955; that in the following month these disorders increased in severity and he suffered pains in his legs. He stated that in early February 1956 he went to his doctor and immediately thereafter stopped working as a burner; that he entered the hospital where he was placed under the care of defendant's doctor and remained there for about 18 days; that by the time he entered the hospital he was suffering from pains in his arms, legs and stomach, and was sweating and nauseated; his teeth were loose. He testified that after he was recovered he still had symptoms of nervousness and sweating.

Sybert testified to having had bad pains in his stomach, pains across his chest, sweats, weakness of legs, constipation, sleeplessness, and an inability to taste foods. He stated that he was hospitalized in January 1956, being given much the same treatment as the other patients; that his last blood test was in May 1956, which showed his blood to be within normal limits of lead content; that he continued to exhibit symptoms of nervousness, and that the doctor who treated him testified that this nervousness would continue to a certain degree for years. Other testimony indicated that at the time of the trial Sybert was perfectly healthy and capable of normal work; that since May of 1957 he had seen no doctors, nor had he taken any medication for the conditions relating to lead poisoning; that he lost six teeth during the time he

354

was suffering from the poisoning; that they became so loose he "just pulled them out."

The rates of pay of the palintiffs varied from about $2.04 to $2.13 an hour. Del Raso's doctor bill was $185, and he was away from work for about two months; Sybert's doctor bill was $110, and he lost 31 days of work, including 15 days in the hospital; Dalpiaz' doctor bill was $160, and he lost 28 days of work in 1956, seven days in 1959, and several more days through the years; Benson's doctor bill was $40, and he was off work for one month.

In January of 1956 the defendant supplied the men working on the burning job a small muzzle-like mask which had a throw-away cartridge. The mask did not have an independent air supply, but was a filter. It hooked over the wearer's face, and the cartridge was to be changed two or three times a day. These masks did not prevent the wearers from breathing in lead gases, and they were still able to smell and taste the gas (paint fumes) through the masks. Although defendant had safety meetings scheduled each morning at which a foreman presided, the plaintiffs were never warned of the danger of fumes from the work they were doing.

Defendant's theory of the case is that until January 1956 it had no knowledge constructive or actual of any hazard of lead poisoning or of the presence of lead paint on the cars which were being stripped; that from the time defendant was charged with knowledge it provided the men on the burning job with masks and respirators, thereby meeting the standard of reasonable care. Defendant further maintains that the trial court erred in withdrawing the issue of contributory negligence from the jury, and that in any event, the verdicts are so excessive as to require a new trial or a substantial remittitur. In support of the argument that there was neither sufficient nor competent evidence presented at the trial

to show that the defendant knew or should have known of the presence of lead paint on the cars, defendant cites Urie v. Thompson, 337 US 163, and Crowley v. Elgin, J. & E. Ry. Co., 1 Ill App2d 481, 117 NE2d 843.

In Urie the U. S. Supreme Court stated that the plaintiff had stated a cause of action under the F.E.L.A., where he had become afflicted with silicosis from inhaling silicon dust which allegedly had blown into the locomotive cabin where he worked, and which allegedly was improperly guarded against inasmuch as the locomotive equipment had not been kept in a proper state of repair. The court held that plaintiff could sue on a theory of general negligence as well as on a theory of violation of a statute (the Boiler Inspection Act). The court then held that silicosis was an "injury" within the meaning of the F.E.L.A., and that the protection of the Act was not limited to injuries and death resulting from accidents; therefore, if plaintiff's silicosis was in whole or in part attributable to defendant's negligence, defendant could be held liable. The court stated:

> ". . . we think that negligence, within the meaning of the Federal Employers' Liability Act, attached if respondent 'knew, or by the exercise of due care should have known,' that prevalent standards of conduct were inadequate to protect petitioner and similarly situated employees. [Citing cases.] Respondent's knowledge, actual or constructive, of the alleged inadequacies of the sanding equipment was a jury question. . . . "

Then, quoting from Sadowski v. Long Island R. Co., 292 NY 448, 455–456, 55 NE2d 497, the court said:

> " 'Ordinary care must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect [citing cases]. It must be commensurate with known dan-

gers. Defendant created the place in which the work was done and supervised the doing of the work by plaintiff and was aware for a period of at least sixteen years of the conditions under which plaintiff was required to work and of the means and methods by which its work was accomplished. It is a matter of common knowledge that it is injurious to the lungs and dangerous to health to work in silica dust, a fact which defendant was bound to know.' "

Justice Frankfurter, concurring in part in the Urie case, is more blunt:

"At the risk of wearisome reiteration it is relevant to say again that the common-law concept of negligence is an antiquated and uncivilized basis for working out rights and duties for disabilities and deaths inevitably due to the conduct of modern industry. In the conscious or unconscious endeavor not to have the human cost of industry fall with cruel injustice upon workers and their families, the law of negligence gives rise to endless casuistry. So long as the gamble of an occasional heavy verdict is not replaced by the security of a modern system of insurance, courts must continue to apply the notion of negligence in situations for which it was never intended. Therefore, if a claim is made that an injury is causally related to a carrier's failure to maintain standards of care appropriate for employment on a railroad, the Federal Employers' Liability Act entitles an employee to establish that claim to a jury's satisfaction. Damages are recoverable under that Act for suffering 'injury.' That term, it seems to me, is sufficiently broad to include bodily injury which nowadays is more specifically characterized as 'occupational disease.' Accordingly, I agree that recovery may be had under the Federal Employers'

357

Liability Act for silicosis, where the facts sustain such a claim, . . ."

Justice Frankfurter, however, did not think that the Boiler Inspection Act covered the injury.

The court, in addition to holding that silicosis, as an occupational disease, came under the F.E.L.A., held that although the F.E.L.A. did not define negligence, the definition of negligence was to be determined from common-law principles as they had been established and applied in the federal courts (i. e., Erie R. Co. v. Tompkins, 304 US 64, did not apply in an F.E.L.A. case).

Crowley v. Elgin, J. & E. Ry. Co., 1 Ill App2d 481, 117 NE2d 843, is a case in which an action was brought under the F.E.L.A. to recover for injuries which plaintiffs sustained from occupational contact dermatitis allegedly caused by petroleum and chromates repeatedly coming in contact with plaintiffs' skin. The court carefully discussed the nature of the injury, the work history of each of the plaintiffs, and the evidence presented at the trial. The court concluded that the jury had sufficient evidence before it to make a finding that defendant knew or should have known of the hazard to plaintiffs' health, and that in the exercise of ordinary care should have known of the danger of contact dermatitis arising from the conditions of employment. For example, the court noted the medical testimony of defendant's doctors and of the expert witnesses, of the publications in the field, and the preventive measures which defendant had taken at various times. The court cited the Urie case and others, including Baumgartner v. Pennsylvania R. Co., 292 Pa 106, 140 A 622, and Harvey v. Welch, 86 NH 72, 163 A 417. The Baumgartner case was quoted as follows:

". . . and the master is presumed to know the nature and qualities of the materials he places in the hands of his servants. In other words, he is presumed to have such knowledge of matters pertain-

358

ing to his business as is possessed by those having special acquaintance with the subjects involved. . . . An employer is presumed to be familiar with the dangers, latent as well as patent, ordinarily accompanying the business in which he is engaged."

The Harvey case was quoted:

". . . Being under a positive duty to exercise care for the safety of his servant, he was bound to make reasonable inquiry for the purpose of informing himself of the natural consequences of using the material which he furnished [oxalic-acid]. A master 'must take into account the properties of such substances as he employs for the purposes of his business and the operation of familiar physical laws upon these substances.' "

 In the instant case the record indicates that there was evidence that the defendant railroad, through its agents, had actual or constructive knowledge that there was a hazard to plaintiffs' health inasmuch as 1) defendant was given notice that there was lead paint on the 31,000 series cars; 2) the defendant was also given notice that plaintiffs were suffering from some occupational hazard connected with the burning job; 3) it is common knowledge that the fumes from burning paint often carry noxious gases which can, through constant exposure, cause illness; 4) the employer is presumed to know the nature of the materials it places in its employees' hands. Each of these will be examined, and the rule stated in Finley v. New York Cent. R. Co., 19 Ill2d 428, 167 NE2d 212, applied:

"Under the Federal Employers' Liability Act a carrier is liable in damages for injury resulting in whole or in part from the negligence of any of its officers, agents, or employees. Assumption of risk is no longer a defense, nor does contributory

359

negligence bar a recovery. In determining whether a verdict in plaintiff's favor is supported on the record, the sole question is whether there is any evidence, considered in the light most favorable to the plaintiff, that defendant was guilty of negligence which contributed in whole or in part to the injury. [Citing cases.] The United States Supreme Court has recently observed that 'Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death.' Rogers v. Missouri Pacific Railroad Co., 352 US 500, . . . ."

1) Dr. Meadows, the defendant's doctor, testified in 1964 that "the use of lead base paint was discontinued 25 years ago, or more." That is, in 1939 or sometime before 1939, lead base paint was discontinued on these cars. One might infer that if the cars had been painted sometime around 1939 or thereafter, the fact that they were lead-painted would come as a surprise to the defendant. The record shows, however, that the 31,000 series cars were purchased in 1937, and obviously were manufactured in that year or earlier. Moreover, one Kirschner, who was an industrial hygienist and "safety man" testified that "as an expert I would guess that there was a greater likelihood that railroad cars painted in 1937 had some red lead than railroad cars that were painted later." Benson

360

testified that the employees called the orange paint on the cars "lead." The other plaintiffs corroborated this testimony. Each of the plaintiffs had seen the orange colored paint; each had called it lead paint. It is uncontradicted and uncontested that there was lead in the paint on the 31,000 series cars upon which the plaintiffs were employed. It would seem that if the foreman had merely seen the paint or talked with any of the men employed in stripping the 31,000 series he would have been put on notice of the fact that there was a great likelihood that lead paint was on those cars. Kirschner testified:

> "The problem of lead hazards involved in the processing or cutting of lead painted steel by oxyacetylene torches is known not only to people who are professionally concerned with industrial health but it is known to lay people as well and to people in the industry. The exposure to an unprotected employee subject to oxyacetylene cutting is among the worst type of exposures and its hazardness is exceeded by very few other lead exposures."

2) Each of the plaintiffs testified that he had complained to a superior regarding the effects of the burning job. Each had spoken to the foreman, Koleto, and had complained that the smoke was causing illness. According to the testimony of the plaintiffs, Koleto had turned a deaf ear to their complaints and had attributed their maladies to a desire to have an inside job during the cold weather, too much to drink, old age, and goldbricking. When they complained to the supervisor he told them there would "be no job picking; you do the job you are assigned to." Del Raso testified that once, after several of them had been laid off for taking an unauthorized break from the burning, he had asked Koleto to put him on another job, to which Koleto had replied: "No, you want to get 9 days off like you had before, but this time I'm going to get you fired." This occurred in

361

■■■■■■■■■■■■■■■■

November; in February, when the foreman again refused his request for a transfer, Dalpiaz went to the general foreman and complained, at which time the general foreman gave him a slip to go to the hospital. The defendant's general argument to all of this is that at the time of the trial Koleto was deceased and therefore not available to contradict this testimony. This fact does not nullify the testimony of the plaintiffs. The defendant did not bring in any other witnesses for the purpose of challenging the testimony of the plaintiffs; there were other supervisory personnel and fellow employees involved in the stripping process; defendant must have had some written records which set forth the activities of Koleto.

■■■ 3) It is common knowledge that fumes from burning paint often carry noxious and toxic gases which can through constant exposure cause illness. From this it can be reasoned that since it is not necessary that the tortfeasor foresee the particular harm which befalls plaintiff, but that the tortfeasor saw or should have seen the general danger and taken precautions; therefore, the defendant in the instant case cannot maintain that because the specific hazard of lead poisoning was not foreseen, defendant was not generally failing to act with due care for the safety of the plaintiffs.

■■ The employer is presumed to know the nature of the material it places in the employees' hands. From the testimony in the record it appears that ample notice was given to Koleto which should have caused a complete investigation.

In F.E.L.A. cases the rule is that a verdict in plaintiff's favor is supported on the record when there is any evidence considered in the light most favorable to plaintiff that defendant was guilty of negligence which contributed in whole or in part to the injury. Finley v. New York Cent. R. Co., 19 Ill2d 428, 167 NE2d 212.

■■■■ As the defendant points out in its brief, the question is not one of whether lead in paint is toxic and

could produce injury to the human system, but whether or not the defendant can be properly charged with negligence in that it failed to take the proper precautions to use reasonable care to furnish its employees with a safe place to work. Bailey v. Central Vermont Ry., Inc., 319 US 350. In Beattie v. Elgin, J. & E. Ry. Co., 217 F2d 863 (7th Cir, 1955), the court stated:

"Inasmuch as plaintiff at the time of the accident was in a place where his assigned duties required him to be, defendant on the issue of negligence was chargeable with knowledge of the conditions which existed there from time to time which in the exercise of reasonable care it could have ascertained. See S. S. Kresge Co. v. Holland, 6 Cir, 158 F2d 495, at page 498. In Pacific American Fisheries v. Hoof, 9 Cir, 291 F 306, at page 308, the court said:

" 'As already stated, the duty (to furnish an employee with a working place and appliances which are safe) is a continuing one, and notice of defects and damages will be imputed to the master where they could have been discovered by reasonable inspection and by the exercise of reasonable care.' "

In Larsen v. Chicago & N. W. Ry. Co., 171 F2d 841, the court made the following statement which we adopt with reference to the instant case:

"Unless there is a complete absence of probative facts, Lavender v. Kurn, 327 US 645, 66 S Ct 740, 90 L Ed 916, the question of whether defendant was guilty of negligence in furnishing a reasonably safe place to work was for the jury to determine from all the facts and circumstances. Bailey v. Central Vermont Ry., supra, 319 US at page 353, 63 S Ct 1062, 87 L Ed 1444. And once there is a reasonable basis for concluding that there was negligence which caused the injury, it is irrelevant that fair minded men might reach different conclusions. In such cases

the trial judge is not justified to substitute his conclusions for those of the jury. Lavender v. Kurn, supra, and Ellis v. Union Pacific R. R., supra, 329 US at page 653, 67 S Ct 598, 91 L Ed 572. Bearing these principles in mind and applying them to our case, we believe there was a reasonable basis for concluding there was negligence which caused the injury, hence the trial court properly left it to the jury to say whether defendant was guilty of negligence in placing the caboose ahead of the pusher engine and whether plaintiff's injuries resulted in whole or in part from such negligence."

There is ample evidence in the record to support the jury's verdicts.

The defendant also objects to the trial court's refusal to give Defendant's Instruction No. 9, as follows:

"The burden is upon each of the plaintiffs to prove by the preponderance or greater weight of the evidence that prior to the time he contracted lead poisoning the defendant had actual knowledge, or in the exercise of reasonable care should have known that the cars upon which such plaintiff was engaged in burning, or some of them, had been painted with a substance containing lead in such quantities that such plaintiff, or any other employee similarly engaged, was reasonably likely to contract lead poisoning while burning or stripping such car or cars. If any plaintiff has failed to sustain such burden of proof, your verdict must be for the defendant and against such plaintiff."

Defendant's Instruction No. 9 is a peremptory instruction since it concludes: "If any plaintiff has failed to sustain such burden of proof, your verdict must be for the defendant and against such plaintiff."

■ ■ ■ In a recent case, Cohn v. Petroleum Heat & Power Co., 44 Ill App2d 23, 194 NE2d 29, the court said:

"Instruction 17 is objected to as being peremptory in that it states that if the jury believes that the defendant has proved any of five enumerated defenses a verdict shall be found for the defendant. Such peremptory instruction comes from the bench and is afforded an aura of importance and credibility that the court should never intend to convey. See 8 DePaul Law Review 141, 143. This kind of instruction has been heartily condemned in the Illinois courts, but is often not found to be reversible error. The courts will only reverse on this ground where an undue number or an inordinate amount of these instructions have been given or it appears that the case of the opposing party has been severely compromised or misstated. [Citing cases.]"

Had the trial court given the instruction in question it would not have been reversible error, although the form of the instruction is highly improper and has been repeatedly condemned by the courts. The failure of the trial court to give the proffered instruction was not reversible error. It is not, nor has it ever been the law that an instruction in the form in which the instruction in question was proffered should be given nor that failure to give an instruction repeatedly condemned by the courts could in any case be reversible error. While it is true that the plaintiff is entitled to an instruction stating his theory of the case, he must proffer an instruction which is proper in form. In the case before us the defendant failed to do this. The defendant relies on the Crowley case to support its contention. The instruction in that case was not peremptory and the case is not applicable.

The giving of instructions is to enlighten the jury and not to create confusion. The jury was adequately instructed.

The defendant also complains of the following instruction given by the trial court at the request of the plaintiffs:

> "The evidence in this case fails to show contributory negligence on the part of any of the plaintiffs, and therefore, you should not consider the question of contributory negligence raised by the defendant."

Before us the defendant argues that there was some evidence of negligence on the part of the plaintiffs; that under the rule laid down in Wilkerson v. McCarthy, 336 US 53, and other cases, it has been held that only where there is a complete absence of probative facts may the issue of negligence or contributory negligence be taken from the jury, and that in the instant case there was such evidence inasmuch as the plaintiffs, knowing that they were being made ill by the paint removal, persisted in remaining on the job.

In Moore v. Atchison, T. & S. F. Ry. Co., 28 Ill App2d 340, 171 NE2d 393, the court held that the burden of proof of contributory negligence in F.E.L.A. cases is on the defendant. (Citing Norfolk & Western Ry. Co. v. Earnest, 229 US 114, 120.) The court said:

> ". . . there must be an evidentiary basis for a finding of contributory negligence. Goodman v. Chicago, B. & Q. R. Co., 289 Ill 320, 7 NE2d 393, cert denied 303 US 640; Williamson v. Wabash R. Co., 355 Mo 248, 196 SW2d 129. In F.E.L.A. cases there is a presumption that the deceased was engaged in the performance of his duty and exercised due care for his own safety at the time of his death. Tennant v. Peoria & P. U. Ry. Co., 321 US 29, 34; Stanford v. Pennsylvania R. Co., 171 F2d 632, 635; Chicago & N. W. Ry. Co. v. Grauel, 160 F2d 820,

825. Defendant offered no evidence to rebut that presumption."

 In F.E.L.A. cases assumption of risks of employment cannot be raised as a defense by defendant employer. In Illinois cases (not F.E.L.A. cases) the courts have held that the employee assumes such risks as are incident to his employment. In Chicago & E. I. Ry. Co. v. Heerey, 203 Ill 492, 68 NE 74, the rule is stated as follows:

"It is the settled law that the servant, when he engages in the employment, does so in view of the risks incident to it; that he will be presumed to have contracted with reference to such risks and assumed the same, and that if he receives an injury resulting from the incidental risks and hazards ordinarily connected with the employment he cannot hold the master responsible. . . . The rule also applies in any case where the servant, during the course of his employment, becomes aware of a defect but voluntarily continues in the employment without objection."

The court cited numerous Illinois cases. In Chicago & E. I. Ry. Co. v. Geary, 110 Ill 383, it is stated that:

". . . when an employee, after having the opportunity to become acquainted with the risks of his situation, accepts them, he cannot complain if he is subsequently injured by such exposure."

In Chicago Drop Forge & Foundry Co. v. VanDam, 149 Ill 337, 36 NE 1024, the court held that the servant will be regarded as voluntarily incurring the risk resulting from the use of defective machinery if its defects are as well known to him as to the master.

 In Mumma v. Reading Co., 247 F Supp 252, the court discussed at considerable length the distinction between contributory negligence and assumption of risk

and pointed out that it is necessary to consider the question since in F.E.L.A. cases contributory negligence, if proved, may reduce the amount of damages which can be allowed by the jury, while assumption of risk is no defense whatsoever. In its opinion the court cited and quoted from Schlemmer v. Buffalo, R. & P. R. Co., 220 US 590, 595–596, which stated:

> ". . . While, as was said in the case when here before, assumption of risk sometimes shades into negligence as commonly understood, there is, nevertheless, a practical and clear distinction between the two. In the absence of statute taking away the defense, or such obvious dangers that no ordinarily prudent person would incur them, an employee is held to assume the risk of the ordinary dangers of the occupation into which he is about to enter, and also those risks and dangers which are known, or are so plainly observable that the employee may be presumed to know of them, and if he continues in the master's employ without objection, he takes upon himself the risk of injury from such defects. Choctaw, O. & G. R. v. McDade [191 US 64, 67, 68, 48 L Ed 96, 100, 101, 24 Sup Ct Rep 24], and former cases in this court therein cited.
>
> "Contributory negligence on the other hand, is the omission of the employee to use those precautions for his own safety which ordinary prudence requires. . . ."

After further discussing the distinction between contributory negligence and assumption of risk the court in the Mumma case stated:

> ". . . the interest which plaintiff was seeking to advance was his economic security. He was doing nothing more than what his duties called upon him to do. To avoid the risk he would have been com-

pelled to quit his job and this the law does not demand. Here, plaintiff must be declared free of contributory negligence as a matter of law because the risk of harm itself was not so imminent, nor was the likelihood of injury so great that, in view of the interest plaintiff sought to advance, no prudent man would face it."

The court further said:

"We think that plaintiff's conduct here, which consisted only of doing his normal work despite a potentially dangerous situation arising from defendant's negligence, was nothing more than classic assumption of risk, that is, mere '. . . voluntary exposure to an obvious or known danger which negates liability, . . .' Pritchard v. Liggett & Myers Tobacco Company, 350 F2d 479 (1965). [The court also called attention to the fact that assumption of risk does not, of course, negate liability in F.E.L.A. cases.] To hold otherwise would be to thwart the purpose of the 1939 Amendment, and would permit the doctrine of assumption of risk to throw aside its Congressionally given shroud and walk the earth again in the clothing of contributory negligence. . . ."

 In the instant case the actions of the plaintiffs were an assumption of the risks of employment and did not constitute contributory negligence. Defendant argues, however, that plaintiffs were contributorily negligent because, despite knowledge of the smoke hazard from the lead paint, they continued on in their employment. The resolution of this issue depends upon the duty placed upon an employee when he discovers that his place of employment is unsafe. Plaintiffs informed the foreman of their plight and, since the foreman is an agent of the defendant, this is notice to the defendant. Upon their giving notice the foreman threatened to have them "fired."

Since the dangerous condition was not remedied, the plaintiffs were confronted with three possible alternatives:

1) Plaintiffs could quit their jobs and find other employment. However, they are not required to do this if the employer fails to provide a safe place to work. Mumma v. Reading Co., 247 F Supp 252.

2) Plaintiffs could have transferred to another job with the same employer where they would not be exposed to the fumes. However, according to the evidence they would have had to take a cut in pay.

3) They could have purchased their own masks. There is no evidence that the plaintiffs were aware of the availability to them of masks. However, even if they were so aware, the negligence of an employer in failing to provide a safe place to work should not operate as a requirement to an employee to purchase his own safety equipment, especially where it is probable that the employee cannot afford such equipment.*

Defendant places great reliance on the Crowley case. That case, in which the employee was held to be contributorily negligent as a matter of law, is distinguishable from the instant case in two important respects: 1) The court states on page 485 that:

> "Substances which will cause a dermatitis in one individual may not cause it in another; individual resistance varies. The external factors involved in contact dermatitis are the extent and frequency of the contact with the irritating substances and the time of individual exposure; personal factors are the susceptibility of the individual, the lightness of his complexion, his age as affecting his capacity to harden resistance to a new exposure, or his loss of resistance to a previously nonirritating exposure and

---

* Satisfactory masks were not furnished to the employees by the employer.

personal cleanliness in avoiding unnecessary contact with the irritant and in removing the contacted substance by promptly washing the exposed parts of the body."

Thus, it seems clear that an employer can provide a safe place to work for the ordinary individual employee and yet an employee can still contract the dermatitis.

 2) In Crowley the employer apparently provided basins in which to wash off the irritating substance, with which plaintiff failed to avail himself. Crowley also failed to use creams supplied by the employer. In finding Crowley contributorily negligent as a matter of law the court said, at page 506:

"We are satisfied that when Crowley knowingly remained in contact with the source of his occupational disease *and failed to use the means provided for protection against the hazards,* he was guilty of contributory negligence as a matter of law." [Emphasis supplied.]

Generalizing, this case supports the rule that an employer is bound to use due care in providing his employees with a safe place to work; and if the employer provides safety precautions of which the employee has failed to take advantage, then that employee is contributorily negligent as a matter of law. There were no safety precautions in the instant case. We conclude that as a matter of law the plaintiffs were not contributorily negligent and the instruction was properly given.

The defendant also raises the point that verdicts and judgments were excessive. We have set out in detail the injuries and the amounts of the judgments. In Illinois there are conflicting decisions with reference to the right of a reviewing court in F.E.L.A. cases to decide that the finding of the jury on the question of damages is against the manifest weight of the evidence. In Bowman v. Illinois Cent. R. Co., 11 Ill2d 186, 142 NE2d 104, the court

held that an Illinois reviewing court has no right to reweigh conflicting evidence and remand an F.E.L.A. case because it finds the jury verdict to be against the weight of the evidence. In Jensen v. Elgin, J. & E. Ry. Co., 15 Ill App2d 559, 147 NE2d 204, the court, on rehearing, held that in F.E.L.A. cases the court does not have the right that the finding of the jury on damages is against the manifest weight of the evidence. It is also so held in Coleman v. Gulf, M. & O. R. Co., 17 Ill App2d 220, 149 NE2d 656 and in Pennell v. Baltimore & O. R. Co., 13 Ill App2d 433, 142 NE2d 497. In Crowley v. Elgin, J. & E. Ry. Co., 1 Ill App2d 481, 117 NE2d 843, the court entered a remittitur in an F.E.L.A. case. This was before the decision in Bowman. The opinion in the Jensen case was written by the same judge who wrote the opinion in the Crowley case. In Smith v. Illinois Cent. R. Co., 29 Ill App2d 168, 172 NE2d 803, the Fourth District of the Appellate Court, after the Bowman decision and without referring to it, held that in F.E.L.A. cases a state court of review has the right to review and weigh the evidence in cases where it is alleged that the verdict was excessive.

 In the instant case, considering the injuries suffered by the plaintiffs and the amounts of the judgments, the verdicts are not excessive, even if we were to consider that the reviewing court could properly review this question in an F.E.L.A. case. In 2 ILP, Appeal and Error, § 782, it is stated:

> "Where the damages in a case are not susceptible of exact computation, but must be determined from the testimony of the witnesses and the opinions expressed by them, an award of damages by a jury will not be disturbed on review on the ground that it is excessive unless it is clearly the result of passion, prejudice, or error, or manifestly contrary to the preponderance of the evidence.

"In other words, the reviewing court will not disturb an award of damages unless the verdict is so excessive or palpably excessive as to indicate that the jury were moved by prejudice, passion, or improper motive, or so flagrantly outrageous and extravagant as to strike everyone with the enormity and injustice of it, or unless the award is not supported by the facts in the record and the court is convinced that it is excessive, or it is apparent from the record that the damages assessed are out of due proportion to the injury and the loss proximately resulting therefrom. . . ."

In Harney v. Sanitary District of Chicago, 260 Ill 54, 102 NE 1070, the Supreme Court of Illinois said:

". . . The amount of damages to be recovered is a question of fact to be determined by the jury, (City of Salem v. Harvey, 129 Ill 344,) and this court has often said that a judgment will not be reversed on the ground that the damages are excessive unless they are palpably and clearly the result of passion or prejudice or manifestly contrary to the preponderance of the evidence. . . ."

In Holsman v. Darling State St. Corp., 6 Ill App2d 517, 128 NE2d 581, the court said:

". . . We have repeatedly held that damages awarded to a plaintiff in a personal injury case will not be set aside unless so palpably excessive as to indicate passion or prejudice on the part of the jury. [Citing cases.]"

We are not passing upon the question as to whether or not this court would have the power in an F.E.L.A. case to consider the alleged excessiveness of the verdict and to reverse or to enter a remittitur. If we held that the power of a reviewing court is limited, as set out in the cases

heretofore cited, then the judgment must stand. If, on the other hand, we were to hold that this court had the power to determine whether or not the judgments are excessive, under the record in this case, we would be compelled to hold that they are not. The judgments of the Circuit Court are affirmed.

Affirmed.

DRUCKER, J., concurs.

ENGLISH, P. J., dissenting:
It seems to me that the majority have failed to apply evenhandedly the same principles to both sides of this case in reviewing the evidence relating to negligence. My colleagues have been able to perceive evidence of defendant's negligence to support the verdict, but are unwilling to acknowledge the existence of evidence that contributory negligence played any part at all, even the slightest, in producing the injuries. Thus, plaintiffs could properly "get to the jury" but defendant could not. On the record before us, I cannot agree with this one-sided use of the jury's fact-finding function.

As to defendant's negligence, there was no evidence whatsoever that defendant knew of the presence of lead paint in the cars which were being dismantled. The record leaves no room for disagreement on this point, so it must be in the light of constructive notice that the majority make the flat statement that "defendant was given notice that there was lead paint on the 31,000 series cars." And this must turn, then, on whether defendant, by the exercise of ordinary care, should have known of the existence of lead in the paint on the cars being stripped. Proof on this issue must be found in the testimony of the plaintiffs themselves or of the other witnesses on their behalf.

I shall consider the other witnesses first. Plaintiffs called Axel Johnson, who testified that he had worked for defendant until his retirement on February 1, 1964; that he had been a car foreman in the area where plaintiffs worked in the fall of 1955 and was familiar with the stripping operation then being performed on the 31,-000 series cars. He then testified: "[I]n my opinion the surface of the material contained some kind of lead." At that point in the trial all the plaintiffs had testified, and it may be noted in passing how desperately weak they must have considered their own case to be (on the point of defendant's knowledge of the presence of lead paint) when they decided it was necessary to introduce the opinion testimony of this witness; for, on cross-examination, he completely demolished the supporting structure of his own direct testimony by testifying that his opinion as to the presence of lead was based on the fact that plaintiffs "got sick from it."

The same witness testified further that he had "been around those cars" for the railroad for 44 years and in all that time had never known of any cases of lead poisoning other than those of plaintiffs. Defendant's industrial physician, called as a witness for plaintiffs, testified to the same effect covering his period of knowledge, commencing in 1945.

In their work plaintiffs wore burner's canvas jackets, leather gloves and leather leggings. They also wore goggles to protect their eyes, but did not use any respiratory masks. The work was performed in the open air, and over a period of 44 years no workmen except plaintiffs had contracted lead poisoning. Thus, going back to 1919 or 1920, there had been a period of at least 18 years, and undoubtedly much longer (since the work was done on old cars being scrapped or rebuilt), when all of the cars which were dismantled had been built prior to 1938. Since the 31,000 series cars on which plaintiffs worked

were built in 1937, this is an important background against which to consider the testimony of plaintiffs' industrial hygiene and safety expert (Kirschner), again on the question of whether defendant, in the exercise of ordinary care, should have known of the existence of lead paint. The witness summed up his own evidence when he testified: "All I'm saying now is that *as an expert I would guess that there was a greater likelihood* that railroad cars painted in 1937 had some red lead than railroad cars that were painted later."

In my opinion, this does not satisfy even the "any evidence" rule on the issue in question. The standard of ordinary care involved in this case is that of defendant's employees who were railroad laymen, whereas the witness spoke "as an expert." Even in that capacity his opinion was couched in the form, "I would guess." And then only as to a "greater likelihood" of the existence of "some red lead."

The same expert testified that the health problems involved in the cutting of lead-painted steel with acetylene torches is known not only to experts but also to lay people in the industry. There is nothing in the record on which the majority may base their apparent conclusion that there is "common knowledge" of injury from inhaling the fumes of burning ordinary paint.[1] As a matter of fact, the 44-year record of illness-free paint burning in this case belies that statement. Our only source of knowledge on this subject is the testimony of plaintiffs' expert, and he meticulously made it clear that the danger about which he was testifying was limited to the burning

[1] See 222 E. Chestnut St. Corp. v. Board of Appeals, 14 Ill2d 190, 193–194, 152 NE2d 465, in which the court found it to be "common knowledge" that automobiles produce fumes which can be injurious to health under some conditions, but refused to take judicial notice of the presence of such conditions in the absence of proof by an expert witness.

of paint containing lead.[2] With this proposition defendant is in complete agreement. The basic difficulties here, however, and, I believe, the sources of great confusion throughout this case, are (1) that the burning of nonlead paint has no probative value to plaintiffs' case in establishing negligence on the part of defendant, and (2) that the well-known injurious properties of fumes from burning lead paint have nothing to do with that issue either, unless it also be shown that defendant knew that lead paint was present in plaintiffs' burning operation. Plaintiffs' supporting witnesses having utterly failed to satisfy plaintiffs' burden on this issue, we must turn to the testimony of plaintiffs themselves.

As related in the majority opinion, the cars plaintiffs started working on in October, 1955 were painted black, with an undercoat of red-orange which the men called "lead paint." Del Raso testified, "There was some orange lead paint on the body bolsters . . . ." Benson said, "We would call it lead." Dalpiaz testified, "We always called it 'lead paint.' " When presented through the first

---

[2] Included in his testimony was the following:

If there are no hazards of dust or gas or fumes the men don't wear masks. *The question is not whether they are using an acetylene torch, the question as to whether or not masks or respirators or air equipment is advisable depends upon whether or not there is lead in the paint* on the metallic surface. It was necessary for me to perform tests to determine whether there was lead in the paint samples and the piece of rod that was submitted to me for analysis. I wouldn't say that mere visual inspection of the piece of rod or paint samples didn't indicate any way or the other whether there was lead in those samples. *Not all paint contains red lead. Not all orange paint contains red lead.* Red lead is still being used as a primer on steel and for structures such as the one that was indicated. It's partially true that other paint having the same color that is used for the same purpose does not contain lead at all. It's not entirely true because it's not exactly the same purpose. [Emphasis supplied.]

377

witness, this testimony was admitted over defendant's objection. Plaintiffs apparently considered it highly important for them to prove that while they were working on the job they recognized the red-orange paint as containing lead. My colleagues also seem to attach great weight to this fact. So do I. But of equal significance is the fact that, so far as the record shows, plaintiffs never talked about the lead paint to anyone except themselves. They did not mention it to their now deceased foreman when complaining about smoke from the paint. And they did not even mention it to their own doctors to whom they went for treatment!

The majority opinion states that if the foreman had "talked with any of the men employed in stripping the 31,000 series he would have been put on notice of the fact that there was a great likelihood that lead paint was on those cars." Indulging in the hypothesis of such a conversation is unnecessary on this record because plaintiffs testified that they did have repeated conversations with foreman Koleto about the fumes and smoke, and there is no testimony whatsoever that they ever mentioned the presence of lead paint—a fact which they had been aware of (according to their testimony) as early as the latter part of October. This becomes all the more important when it is realized that all of the plaintiffs had done a substantial amount of car burning prior to October, during all of which earlier operations they would have been working on paint which did not contain red lead.[3]

Further testimony of plaintiffs is of interest when considered against the background of their amended complaint. There it is alleged that they "were compelled" to

---

[3] Del Raso had worked as a car burner off and on since 1951 and steadily since 1954; Benson part of the time in 1952 and 1953 and regularly after the first week in October 1955; Sybert regularly since early in the year of 1955; and Dalpiaz off and on from 1952 and steadily starting in July of 1955.

378

work at the job of car stripping where they inhaled lead paint fumes; and that defendant's negligence lay in "compelling" plaintiffs to work at this job when, by the exercise of ordinary care, it should have known that they would contract lead poisoning. Plaintiffs testified that they were qualified as carmen under their union contract and that, with sufficient seniority, they could decide whether they wanted to work in the shop or on the car-burning job. It is undisputed that all plaintiffs had the seniority to take them off the burning job at any time they might have elected during the last months of 1955 and early 1956; and it is also undisputed that there were vacancies in the shop which could have been theirs upon demand during all that period. The differential in pay was only five cents per hour, which, at plaintiffs' scale, amounted to only 2½%, or slightly less.

When they returned to work after their illnesses, all of the plaintiffs exercised their union right to opt for a shop job. As explained by Dalpiaz: "If you have seniority and certain jobs come up on bulletin you can have the job if you have enough seniority and you bid on it. I haven't gone back as a burner at any time since I went back." There is no claim that this right to job transfer was not available to plaintiffs throughout the critical months, and yet the record discloses that none of the plaintiffs ever bid for a shop job during that period. Nothing in the alleged conversations with the deceased foreman raises any question on this score.

Considering, then, all the evidence introduced by plaintiffs to meet their burden of proof on the proposition that defendant, by the exercise of ordinary care, should have known of the presence of lead paint in the burning operation (Urie v. Thompson, 337 US 163), it seems to me that the proof is either wholly lacking or, at best, very slim indeed. Assuming that the record does contain sufficient evidence to have permitted the case to go to the jury on this point, it is perfectly clear that all such proof

379

originated with plaintiffs themselves. They were the only ones who knew of the presence of what they thought was lead paint, and it was only through them that this knowledge, somehow or other, without testimonial explanation, was transmitted so that the defendant should have known also. Are not the plaintiffs then faced with the corollary propositions that, knowing of the existence of the lead paint, they also knew (by the common knowledge of laymen, as testified to by their own expert) of the danger to health from inhaling smoke and fumes therefrom; that it then became their duty to avoid exposure to such danger through the exercise of ordinary care; that it was admittedly within their power to avoid this dangerous exposure by bidding on back shop jobs to which their union seniority entitled them; and that they did not do so. I believe the situation thus presents stronger evidence of contributory negligence than the evidence of defendant's negligence which was permitted to go to the jury. I believe, therefore, that the trial court erred in removing the issue of contributory negligence from the jury's consideration.

Perhaps the jury might have decided that the 2½% pay differential, small as it is, was too much for the plaintiffs to have given up, through the exercise of ordinary prudence, in exchange for a safer job. Perhaps the jury would have reached the same verdict it did. We cannot know, but, of course, that is not the question which is presented to us. The determination on the issue of contributory negligence is one to be made neither by us nor by the trial court, but by the jury alone, unless "there is a complete absence of probative facts." Lavender v. Kurn, 327 US 645, 653. And this rule applies to all negligence alike, whether that of defendants or plaintiffs, however often its application to the conduct of a plaintiff seems to be overlooked or ignored, as I believe it has been in this case, without deferring to the exclusive legis-

lative authority to repeal the defense of contributory negligence.

There are many decisions declaring this two-way principle. One from which the majority opinion has quoted at length is Mumma v. Reading Co., 247 F Supp 252, 254 (ED, Penn, 1965). In that case there were two similar accidents covered by separate counts. As to the first accident, the court decided that there was no evidence of contributory negligence and took that issue from the jury. As to the second accident, however, the court recognized that there was some such evidence, "although it was extremely meager," and felt itself bound, therefore, to apply the rule that "the sufficiency of the evidence to take the issue of contributory negligence to the jury is to be tested by the same standards that are used to test the sufficiency of plaintiff's evidence on the issues of negligence and proximate cause." See also Schulz v. Pennsylvania R. Co., 350 US 523; Wilkerson v. McCarthy, 336 US 53, 63; and Justice v. Pennsylvania R. Co., 41 Ill App2d 352, 357–358, 191 NE2d 72, and cases there cited. In the Justice case, the court concluded: "Under the facts in this case it is not apparent that there was no possible basis to find some contributory negligence. Thus, it was not a question of law for the court and the instruction (on contributory negligence) should have been given." (Page 358.) It should be remembered also that the minimum of evidence required as tending to show contributory negligence under the applicable "any evidence" rule, becomes further minimized because the F.E.L.A. test of the sufficiency of such evidence is only whether it played any part, no matter how small, in actually bringing about or causing the plaintiff's injuries. Page v. St. Louis Southwestern Ry. Co., 349 F2d 820 (5th Cir, 1965).

The principal case relied upon by the majority is the Pennsylvania nisi prius opinion in Mumma v. Reading Co.,

381

247 F Supp 252 (ED, Penn, 1965). I believe that reliance to be misplaced for a number of reasons. As I have mentioned, the Mumma case involved two injuries to the same plaintiff from falling on icy walkways while his boots were soaked with oil which defendant had negligently permitted to remain standing in the work area. The court let the issue of contributory negligence go to the jury as to one of the accidents but not as to the other. Meager evidence of contributory negligence was considered sufficient for the purpose under one count, but the court stated flatly as to the other count: "The record is utterly barren even of a suggestion that the plaintiff could have acted otherwise than he did, short of stopping work entirely." (Page 254.) This, of course, is by no means true in the case before us, so Mumma is distinguishable at the outset. Furthermore, it is only because of his preliminary decision that there was *no* evidence of contributory negligence that the judge in Mumma was able to find assumption of risk based upon the authorities cited in his opinion. The majority here overlook that important fact, and also overlook the vital language of the other opinions cited in Mumma which, under the facts of our case, make them applicable to my conclusion rather than to theirs; e. g., Pritchard v. Liggett & Myers, 350 F2d 479, 484–486 (3rd Cir, 1965).

As another example, the judge in Mumma, and the majority here, quote a definition of assumed risk from the opinion in Schlemmer v. Buffalo, R. & P. R. Co., 220 US 590, 595–596. I shall not quote the whole passage again, but the first part of the key sentence is very important. It states:

> *In the absence of statute taking away the defense, or such obvious dangers that no ordinarily prudent person would incur them,* an employee is held to assume the risk of the ordinary dangers of the occu-

pation into which he is about to enter . . . . [Emphasis supplied.]

Thus the Supreme Court set down two preliminary considerations which would remove a case from application of the assumed risk doctrine. First was statutory removal which had not been enacted at the time of Schlemmer. Second was the existence of contributory negligence—failure to meet the standard of the "ordinarily prudent person." Both these considerations were open to the judge in Mumma because there was absolutely no evidence of contributory negligence and the plaintiff there "would have been compelled to quit his job" (page 257) in order to avoid the risk. Not so here on either point.

After the Supreme Court's opinion in Schlemmer, the Congress amended the statute to remove assumed risk as a defense, but it did not eliminate the defense of contributory negligence. I consider this highly significant. The result is that even if the same facts might, in a given case, constitute both assumed risk and contributory negligence, the defense of contributory negligence would still be available to the defendant. This proposition is set forth in Restatement, Second, Torts § 496 Ad in comment on the principle of assumption of risk:

> *Relation to contributory negligence.* The same conduct on the part of the plaintiff may thus amount to both assumption of risk and contributory negligence, and *may subject them to both defenses.* His conduct in accepting the risk may be unreasonable and thus negligent, because the danger is out of all proportion to the interest he is seeking to advance,
> . . . .
> . . . In theory the distinction between the two is that assumption of risk rests upon the voluntary consent of the plaintiff to encounter the risk and take his

chances, while contributory negligence rests upon his failure to exercise the care of a reasonable man for his own protection. *Where the plaintiff voluntarily consents to take an unreasonable chance, there may obviously be both.* [Emphasis supplied.]

I come, then, to the question of whether there is any authority to support my belief that there is evidence that plaintiffs did not exercise ordinary care for their own safety. And there is. The case of Crowley v. Elgin, J. & E. Ry. Co., 1 Ill App2d 481, 117 NE2d 843, is directly in point. This court held in that case that Crowley's persistence in working at a job which was causing his illness, when his union seniority entitled him to transfer to a safer job, constituted contributory negligence as a matter of law.

In the Crowley case there were three roundhouse employees who sued under F.E.L.A. for occupational dermatitis acquired through contact with diesel oil in the servicing of defendant's locomotives. After the source of the plaintiffs' skin trouble had been medically identified, plaintiffs Kern and Criche asserted their union seniority rights to accomplish transfer to a back shop job removed from the handling of diesel oil. Crowley did not. He insisted on continuing in his roundhouse job, although within a very short time he, too, could have demanded such a transfer to the back shop.[4]

Judgments in favor of Kern and Criche were affirmed by this court but with remittiturs because they were insufficiently supported by proof of monetary damage. The judgment in favor of Crowley was also affirmed but with a much larger remittitur based upon application of the

---

[4] The opinion does not disclose the wage differential between the two jobs, but it would seem probable from Crowley's persistence in the face of illness that the roundhouse job, like the burning job in the instant case, carried a somewhat higher rate of pay.

contributory negligence principle, this court having found that the evidence showed him to have been guilty of contributory negligence as a matter of law.

The union agreement in the Crowley case was similar to, if not identical with, the one in the case before us. "Crowley could not take another machinist's position by displacing another man. He could only bid in on a vacancy. Similarly, the defendant could not transfer him without his consent or refuse to allow him to work at any job to which his seniority entitled him." (Page 488.)

In concluding its opinion as to Crowley, this court said:

> On February 19, 1948, he returned to the job in the roundhouse, which he knew was the cause of his condition and persisted in working there despite the fact that there have been vacancies in the back shop upon which he could have bid successfully by virtue of his seniority. The folly of his course of conduct is made clear by contrasting his case with those of Kern and Criche. They transferred to jobs in the back shop.
>
> . . . . . .
>
> We are satisfied that when Crowley knowing remained in contact with the source of his occupational disease and failed to use the means provided for protection against the hazards, he was guilty of contributory negligence as a matter of law. [Pp, 505–506.]

My colleagues attempt to distinguish Crowley on two grounds. First, they say, "an employer can provide a safe place to work for the ordinary individual employee and yet an employee can still contract the dermatitis." Certainly, when it came to the decision in the Crowley case, the question of individual sensitivities played no part. And I fail to see any relevance to the case now before us.

385

The second ground of attempted distinction has more apparent basis but fails completely upon close examination. Pages 505 and 506 of the Crowley opinion make it abundantly clear that the reason for the court's finding of contributory negligence as a matter of law was Crowley's stubborn refusal to transfer to a safer job after he had learned the cause of his dermatitis. To be sure, in summing up, as set forth in the quotation above, the court mentions, almost parenthetically, that Crowley had also "failed to use the means provided for protection against the hazards." So the majority in our case grasp at those words and declare the case distinguished, concluding very broadly, indeed, that "if the employer provides safety precautions of which the employee has failed to take advantage, then that employee is contributorily negligent as a matter of law. There were no safety precautions in the instant case."

Now, I would not go near so far in declaring contributory negligence as a matter of law. And the Crowley opinion, I am certain, makes no such pronouncement. The "safety precautions" referred to in the Crowley case consisted of washing facilities and protective creams. The opinion states:

> None of the plaintiffs used the washing facilities available to them prior to the outbreak of their dermatitis. Crowley washed only at the noon hour. Kern did not wash with soap and water, but used kerosene and waste to clean his hands, a practice which Dr. Schwartz testified was more likely to cause dermatitis than any other. Criche used kerosene and oil to clean his hands, but he never washed himself at work. After the protective creams and ointment and the detergent and scrubbing agent were supplied, Crowley used the protective creams only two days, and used the detergent but not the scrub-

386

ber. Kern used the protective creams only half a dozen times and he never used the corn-meal scrubber. Criche has never used these preventatives. (Pp 497–498.)

It therefore appears that, while all three plaintiffs essentially failed to take advantage of these facilities, Crowley did just about as well as the others. Yet the other two plaintiffs were not found to have been contributorily negligent and Crowley was! This leads to the inescapable conclusion that the only critical evidence on the issue of negligence was Crowley's failure to bid for a back shop job when he had that option—the same option which was available to plaintiffs in the case at bar. But with what contrary results! This court found Crowley guilty of negligence as a matter of law, whereas the majority in the present case skip clear across the broad area occupied by questions of fact, to "conclude that as a matter of law the plaintiffs were not contributorily negligent."

I would place this case in the extensive middle ground. I maintain that existing law properly applied to the evidence in this record commands that the jury determine the question of negligence as to both plaintiffs and defendant. In my opinion the trial court erred in preempting the jury's function on the issue of contributory negligence, and we compound the error by not correcting it.

Finally, I must also dissent from the majority's refusal to pass upon the question as to whether we have the power to review the issue of excessiveness of verdicts in F.E.L.A. cases. I believe we do. Smith v. Illinois Cent. R. Co., 29 Ill App2d 168, 172 NE2d 803; Deen v. Gulf, Colo. & S. F. Ry. Co., 353 US 925; Gulf, Colo. & S. F. Ry. Co. v. Deen (Tex), 312 SW2d 933, 942 (1958), cert den 358 US 874; Rogers v. Missouri Pac. R. Co., 352 US 500; Rivera v. Atchison, T. & S. F. Ry. Co., 61 NM 314,

299 P2d 1090, 1092–1093; 79 ALR2d 553. I do not consider Bowman v. Illinois Central R. Co., 11 Ill2d 186, 142 NE2d 104, to be in point on this question.

Under the instructions given to the jury in this case, I would not be able to say that the damages awarded were unreasonable and excessive. Under proper instructions including the issue of contributory negligence, the verdicts might be somewhat different.

I would reverse and remand for a new trial.